Filed 9/17/15  P. v. O'Rourke CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES GRANT O'ROURKE,<br><br>Defendant and Appellant. | C071905<br><br>(Super. Ct. No. 11F05730) |

Defendant James Grant O'Rourke appeals following conviction on multiple counts of stalking his East Sacramento neighbors in violation of a restraining order, after having a prior stalking conviction for harassing the same neighbors, plus misdemeanor violation of the court order.  (Pen. Code, §§ 646.9, 166, subd. (a)(4).[1])  Defendant was sentenced to state prison for seven years.

---

[1]  Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

At trial, the defense theory was that defendant's conduct was merely rude and offensive, not criminal. Thus, his mental state and the reasonableness of the victims' fear were key issues. On appeal, defendant contends the trial court erroneously admitted evidence of his numerous prior acts of harassment under Evidence Code section 1101, subdivision (b), and that admission of this evidence violated his constitutional rights to due process and a fair trial. Defendant also claims sentencing error.

We order the convictions on counts two and four, stalking in violation of a restraining order, stricken as duplicative of counts one and three, stalking with a prior stalking conviction. We also order a section 654 stay of the misdemeanor sentence and correction of presentence custody credits. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

The prosecution charged defendant with the following:

**Count one** -- stalking Hunter Ahlberg between October 3, 2009, and August 16, 2011, with defendant having a prior stalking conviction in November 2006 (§ 646.9, subd. (c)(2));

**Count two** -- stalking Hunter Ahlberg between October 3, 2009, and August 16, 2011, while a temporary restraining order issued in December 2006 was in effect against defendant (§ 646.9, subd. (b));

---

Section 646.9 provides in part: "(a) Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . . [¶] (b) Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, shall be punished by imprisonment in the state prison for two, three, or four years. [¶] (c) . . . [¶] (2) Every person who, after having been convicted of a felony under subdivision (a), commits a violation of this section shall be punished by imprisonment in the state prison for two, three, or five years. . . ."

2

**Count three** -- stalking Tara Loogman-Ahlberg between November 16, 2009, and August 16, 2011, with defendant having a prior stalking conviction in November 2006 (§ 646.9, subd. (c)(2));

**Count four** -- stalking Tara Loogman-Ahlberg between November 16, 2009, and August 16, 2011, while a temporary restraining order was in effect against defendant (§ 646.9, subd. (b)); and

**Count five** -- misdemeanor violation of the court's restraining order (§ 166, subd. (a)(4)).

It was also alleged that defendant served a prior prison term (§ 667.5, subd. (b)).

### The Prosecution Case

### Prior Incidents - 2003 to 2006

Over defense objection, which we discuss *post*, the trial court allowed evidence of defendant's prior conduct involving the same victims that led to his 2006 stalking conviction. The prior incidents occurred from 2003 to 2006. Defendant was sentenced to prison for three years.

In October 2002, before Hunter met Tara,[2] Hunter bought his home in the 400 block of 40th Street in Sacramento. He and Tara met in 2003 and married in 2004.

When Hunter moved into the 40th Street home, defendant, who lived across the narrow street, tried to collect money from Hunter, claiming he (defendant) had been watering the yard of Hunter's new home pursuant to an agreement with the seller. Hunter did not pay and told defendant he should contact the seller. Hunter testified, "That was the end of it."

Hunter placed light bulbs in existing outdoor fixtures to illuminate his front yard. Defendant complained they shone on his property. Defendant called code enforcement,

---

[2] We adopt the parties' usage of the victims' first names, Hunter and Tara, for clarity and convenience.

but an inspector came out at night and found no code violation. Defendant made several other complaints to code enforcement, only one of which resulted in action by the city; Hunter was required to replace some sidewalk.

In June 2003, defendant came out to sit on his porch and told Hunter that Hunter was "really pissing [defendant] off." Defendant did not explain what he meant, and Hunter did not ask.[3]

Defendant started shining a high-powered flashlight at Hunter's home, and defendant's behavior grew increasingly hostile. On a regular basis over the course of three years, defendant sat on his porch or stood in front of his house, staring at the victims in an intimidating manner. He called them names, yelled at them, watched them with binoculars, took photos of them and their visitors, sprayed water on Hunter, threatened the victims' lives, and gestured shooting a gun.

Hunter installed a security camera in October 2003 on the front of his house.

Tara testified that in January 2004, defendant walked onto the victims' property and leaned on Hunter's car, carrying a handgun protruding from a canvas bag, yelling for Hunter to come out.[4] From inside the house, Tara saw defendant point the gun at her, with the gun sticking out of the bag. She was extremely scared and thought defendant was going to shoot her, so she ducked down and crawled to another room where she saw that defendant was still there. Then he walked off. Defendant yelled, " 'Do you see me now, [H]unter? Do you see me now? You're really starting to piss me off, Hunter.' " Defendant taunted Hunter to come out and be a " 'real man.' " When Hunter came into

---

[3] In closing argument, defense counsel asked the jury to infer that what initially "pissed off" defendant was that Hunter was making friends with neighbors with whom defendant did not get along.

[4] Tara testified this happened on January 2, 2004, but the jury was told that a search of police records showed a report about defendant and a gun on January 4, 2004, and a report about defendant with a gun in a bag on February 8, 2004.

4

the front room and looked out the window, he did not see the gun but did see defendant standing halfway up Hunter's driveway, holding a bag by its straps that appeared to contain a heavy angular object. Hunter feared for the safety of himself and Tara. The victims called the police. Multiple officers responded, including a police helicopter. The incident took place outside the view of the victims' security camera, and consequently, the incident was not recorded. The police told the victims they could make a citizens' arrest, but defendant would probably do the same. The victims did not make a citizens' arrest. They later added more security cameras.

Once Tara knew defendant had a gun, she felt that defendant's harassing behavior was "a thousand times scarier."

From 2004 to 2006, defendant routinely shone a high-powered flashlight or laser beam into the victims' home a few times a week. The lights were strong enough to pierce the victims' window coverings. He sometimes shone the flashlight or laser in their faces when they were outside their home. When Tara was outside, defendant sat on his porch and watched her, sometimes with binoculars, and took photographs of her. He often called her "bitch" or " 'fucking ugly bitch.' " Whenever she was outside washing her car, defendant would sit at the front edge of his property in a lawn chair and watch her with binoculars or take photographs of her. She sometimes saw him standing outside her workplace, staring at her. Defendant's behavior scared Tara.

Tara began carrying a video camera around her neck when she went outside. In March 2004, on an occasion when she was taking out the trash, defendant yelled, " 'You have that, and I have a gun,' " and " 'Do you like that, you stupid bitch.' " When Tara brought out more trash, she turned on the video camera, which captured defendant shining a flashlight at her and saying, " 'Take a picture of that. Take a picture of that, fucking ugly bitch.' " Later that month, a noise awakened Tara, and she saw defendant running through her backyard. She "freaked out" and called the police, who came out but took no action. Tara could not get back to sleep.

5

In April 2004, Hunter washed his car and parked it across the street in order to pull Tara's car into the driveway. Defendant sprayed Hunter and his car with a hose and verbally taunted him. When Hunter was watering his front yard a few days later, defendant called him a "fucking punk."

The victims tried mediation to resolve the problems, but the mediation center, which did not have security, terminated the process when defendant threatened the victims' lives.

In June 2004, as Hunter was getting out of his car, defendant walked up to the driveway and said, " 'You're dead, Hunter.' " Hunter took it as a serious threat and believed defendant was capable of carrying it out.

In August 2004, defendant "flipped [] off" Hunter and called him "paranoid" and a "fucking punk."

In February 2005, defendant demanded that the victims take down the security camera, or " 'I'm going to do something about it.' "

The jury saw footage from the security cameras capturing some of defendant's behavior, e.g., defendant shining the blinding flashlight and loudly berating Hunter as Hunter replaced an outdoor light bulb.

The victims put up a fence and got a small dog

In June 2005, as Tara removed groceries from her car, defendant said something like, " 'You're going to die, bitch.' " Two days later, as she walked her dog, defendant said, " 'You're alive now, bitch, but not for long.' " Defendant frequently threatened Tara's life.

In 2006, defendant was prosecuted for stalking the victims. Even while the charges were pending, defendant appeared to take photographs of Tara, pointing his camera at her with the zoom lens. Tara asked defendant to quit staring at her. He said people stare at him all the time. She got flustered, thinking that of course people stare at

6

someone photographing them from close range, and said, " 'I wonder why.' " He said, " 'Do you have a problem today?' " and he asked her not to lie to the police or in court.

Also, around the time of the prior trial, Tara observed police remove two guns from defendant's home.

The parties stipulated that, on November 7, 2006, defendant was convicted of stalking Hunter and Tara, and in December 2006, the trial court issued a protective order restraining defendant from contact with Hunter and Tara for 10 years, until December 2016.[5] Defendant was sentenced to four years in prison.

### Current Offenses - 2009 to 2011

After defendant's release from prison, he returned to the neighborhood in late 2009, stayed with a neighbor for awhile, and moved back into his home in February 2010.

On October 3, 2009,[6] while his home was still boarded up, defendant resumed glaring at the victims from his driveway or the sidewalk in front of his house, not quite as often as before, but a couple of times a week.

On multiple occasions over the next two years, defendant glared angrily at the victims and grunted or whistled or sometimes yelled at them, despite the restraining order that was still in place from the first prosecution. Defendant glared angrily or "flipped []off" Hunter as he left for work or came home. A couple of times a week, he walked along the street as Tara or Hunter bicycled or drove to work. Defendant walked briskly

---

[5] The order stated that defendant "must have no personal, telephonic, or written contact with the protected persons named below [Hunter, Tara, and two other neighbors]," and "must have no contact with the protected persons named below through a third party, except an attorney of record."

[6] At sentencing, the trial court noted this was a mere four days after defendant's discharge from parole.

to keep up and said, " 'You're pissing me off.' " When Tara arrived home, defendant stood at the end of his driveway with his hands on his hips and his eyes fixed on her.

The victims wanted to move but would have had to disclose to prospective buyers that a stalker lived across the street, which according to a realtor, reduced the value of their home $50,000 to $100,000.

A police officer testified he responded to a call about a restraining order violation in December 2009 and spoke with Tara, who appeared very nervous and anxious about defendant staring at them.

One day in January 2010, defendant stood in his driveway staring at Tara while slapping some papers against his leg in a threatening manner. Tara contacted the police, who told defendant to leave the victims alone.

Tara saw defendant at the mall and tried to avoid him, but he waited in the courtyard and then followed her until she lost him.

On February 4, 2010, defendant flipped off the victims with his middle finger, as he did a few times per month after his release from prison. The next day, defendant glared at the victims angrily with clenched fists, and they called the police.

On February 21, 2010, while Hunter was gardening, defendant rode up on his bicycle and said, " 'Big boy back in town.' "

On multiple occasions in 2010, defendant glared angrily at the victims, displayed his middle finger, and yelled "motherfuckers" or " 'fuck off you punk.' "

When Hunter bought a new truck, defendant took hundreds of photographs of the victims coming and going in it. Defendant also took photographs of the victims, their house, their friends, and the neighborhood.

In June 2011, as Hunter left for work, defendant said, " 'Fuck you' " and " 'Son of a bitch.' "

A police officer testified that in June 2011, he followed up on the ongoing problem by parking an unmarked car near defendant's home for two hours. The officer

8

observed defendant standing or sitting outside, staring fixedly at the victims' house, and taking photographs.

On August 16, 2011, Hunter left for work, holding a digital camera. Defendant slapped his rolled-up mail in an intimidating manner. Hunter turned on his camera and got in his car. Defendant told him, "Fuck off." Hunter asked to be left alone. As Hunter drove off, defendant walked in the middle of the street behind the vehicle. Hunter was shaken, because defendant's harassing conduct was escalating.

Police viewed the recording and the following day set up surveillance and arrested defendant for violating the restraining order. Defendant told police he was falsely accused, he was trying to get the court order rescinded, and the victims lied in court.

Defendant had been taking pictures just before he was arrested. Upon his arrest, officers seized the camera. It contained about 1,200 photos, mostly of the neighborhood, including trees, sunsets, the victims' house, cars, license plates, neighbors and friends, and hundreds of vehicle photos, but apparently no photographs of the victims.

Neighbors testified, corroborating the victims' account of defendant's behavior and that the victims did not respond in kind. A neighbor testified his son was punched by defendant while the son was changing a flat tire on his car. Defendant had approached with his camera, presumably to support his claim that the neighbor was doing illegal car repairs in their yard. Hunter observed this incident and concluded defendant was capable of physically harming Hunter or Tara. Another neighbor testified she bought a camera in 2009 after she became frightened by red flashes coming from defendant's porch when she walked down the street.

**The Defense Case**

Defendant did not testify.

Neighbor Eugene Ulm testified he lives with his father, who is friends with defendant. According to Ulm, Hunter stated in December 2008, " 'we didn't like the [defendant]. We got together and we ran him out of town.' " Ulm claimed that Hunter

9

admitted lying in court. Ulm claimed he saw Hunter in the street three times in 2011, yelling at defendant's house, " 'we are going to get you,' " " '[f]uck you,' " and "we are going to get you. We are tired of your [] bullshit."

Defendant's next-door neighbor, Joan Mangold, testified defendant and Hunter yelled profanities at each other, before and after defendant went to prison, but she never witnessed any threats. On cross-examination, she acknowledged defendant had problems with a half dozen neighbors, including a dispute with her about her cat soiling his yard. She told police she tried to stay out of defendant's way so he would not yell at her. She saw him using a camera and binoculars, and she let him use her property to take photographs. She knew defendant had a problem with the lights on the victims' property, which also shone into her residence. She said the lights have not always shined in the same location.

### Prosecution Rebuttal

The prosecution called as a rebuttal witness a defense investigator, James McCoy, who testified that when he interviewed Ulm, Ulm never mentioned any conversation with Hunter in December 2008. The defense elicited on cross-examination that the investigator never specifically asked Ulm if he had had any conversations with Hunter about the previous trial. McCoy also testified he interviewed Mangold, and she said she had never seen Hunter harassing or yelling at defendant.

### Verdicts and Sentencing

In June 2012, the jury returned verdicts convicting defendant on all counts.

On June 29, 2012, the trial court found true defendant's prior stalking conviction in 2006 and service of a prison sentence. The trial court sentenced defendant to a total of seven years in prison, as follows:

Five years for count one, stalking Hunter with a prior stalking conviction;

One year (one-third the middle term) for count three, stalking Tara while having a prior stalking conviction; and

One year for the section 667.5, subdivision (b), enhancement for the prior prison commitment.

The court imposed but stayed execution of sentence on counts two and four, stalking Hunter and Tara in violation of the restraining order.

The court ordered no additional time for the misdemeanor violation of the court order.

## DISCUSSION

## I. Evidence of Prior Misconduct

Defendant argues the trial court erred in admitting evidence of his prior misconduct under Evidence Code section 1101, subdivision (b). He also claims the evidence violated his constitutional rights to due process and a fair trial. We disagree.

## A. Background

The prosecutor moved in limine to admit evidence of defendant's prior stalking conviction and prior conduct against the same victims to prove his intent and motive to place the victims in fear, and the reasonableness of the victims' fear.

Defense counsel stated there was no authority allowing the prior conviction[7] but also stated, "I don't disagree that some or part of the prior history should come in as it does have some probative value. [¶] The problem becomes either that the amount of it

---

[7] There is authority for admitting evidence of the conviction. The fact of a conviction enhances the probative value of the other crimes evidence by eliminating the uncertainty that the prior events happened and lessening the danger of confusing the issues. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 (*Ewoldt*); *People v. Kelley* (1997) 52 Cal.App.4th 568, 579 (*Kelley*).) Evidence of the conviction also decreases any prejudice by minimizing the chance the jury might punish the defendant for the prior offense. (*Ewoldt*, at p. 405 [prejudicial effect of uncharged crime evidence is heightened by the circumstance that defendant's uncharged acts did not result in a conviction because the jury might be inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses.]; *Kelley*, at p. 579.) Defendant does not challenge the admission of evidence he was previously convicted of stalking the victims.

11

could get to the point in time where 352 analyses would find it to be unduly burdensome to the Court. I think there has got to be some natural limits to that. . . ." The defense did not suggest any particular limits or that any specific evidence be excluded. Nor did the defense raise any constitutional claim in the trial court.

The prosecutor argued the prior prosecution, in which the victims testified against defendant, was relevant to defendant's motive for harassing the victims, because defendant had made statements that he was put in prison because the victims lied in court. The prior conviction also was relevant to explain the gap in the harassment and would help the defendant in that the jury would not be tempted to convict defendant in this case based on prior conduct for which he had already been prosecuted and punished. However, the prosecutor expressed uncertainty as to whether she would introduce the evidence that defendant claimed the victims committed perjury when he talked to the police because the defense might seek to introduce the rest of defendant's statement that he was supposedly in the process of proving he was falsely convicted.

The trial court ultimately ruled the prior conduct evidence was admissible under Evidence Code section 1101, subdivision (b). There was sufficient similarity between the uncharged and charged offenses to be admissible to prove defendant's intent. Further, the prior acts evidence was material to defendant's intent and motive and to the victims' state of mind -- which they reasonably feared for their safety. The court considered Evidence Code sections 210 and 352 and concluded the probative value of the evidence outweighed any prejudicial impact. The evidence "is not particularly inflammatory" and should not confuse the jury; to the contrary, it would present a more complete picture of the relationship between defendant and the victims. The evidence was not remote, having occurred over the past several years with a break during defendant's incarceration. The evidence should not take up an "exorbitant" amount of time, as it did not appear the prosecution intended to introduce every detail of the prior conduct between defendant and these two alleged victims. The evidence was probative on issues of defendant's intent

12

and the reasonableness of the victims' fear.  The court also found the prior conviction itself was probative of defendant's motive, and his statement to police was admissible.  Defendant had expressed his belief that he was wrongly convicted by perjured testimony from the victims.  The prior conviction showed defendant's attitude toward the alleged victims and went to his motive to place them in fear.  The court concluded "the probative value far outweighs any prejudicial [e]ffect."  The court stated it would give a limiting instruction to the jury.  The court granted the defense request for a continuing objection.

### B.  Analysis

Evidence Code section 1101, subdivision (a), makes evidence of a person's character generally inadmissible when offered to prove his conduct on a specified occasion, but subdivision (b) states, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

Our Supreme Court has counseled, "[e]vidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis.  [Citations.]' [Citations.]  'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.)  "Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a[n Evidence Code] section 352 concern.  Evidence may be excluded under [Evidence Code] section 352 if its probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [¶]  Thus, the admissibility of uncharged crimes depends upon three factors:  (1) the materiality of the facts sought to

13

be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact (i.e., probative value); and (3) the existence of any rule or policy requiring the exclusion of relevant evidence (i.e., prejudicial effect or other section 352 concern)." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.) "In order to satisfy the requirement of materiality, the fact sought to be proved or disproved must be either an ultimate fact or an intermediate fact from which such ultimate fact may be inferred. [Citation.] Elements of the offense . . . are ultimate facts." (*Id*. at p. 239.) Motive is an intermediate fact. (*People v. Thompson* (1980) 27 Cal.3d 303, 315, fn. 14.)

We review the trial court's ruling for abuse of discretion (*People v. Jones* (2013) 57 Cal.4th 899, 930 (*Jones*)) and conclude the trial court did not abuse its discretion here. The evidence of defendant's prior harassment of the victims was admissible to prove two ultimate facts, defendant's intent and the reasonableness of the victim's fear, and an intermediate fact, defendant's motive. Thus, the evidence was highly probative.

For the crime of stalking, the prosecution must prove defendant harassed and made a credible threat with the intent to place another person in fear for his or her safety or the safety of his or her family. (§ 646.9, subd. (a).) "For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) " 'Credible threat' means a verbal or written threat . . . or a threat implied by a pattern of conduct . . . made with the *intent to place the person that is the target of the threat in reasonable fear* for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to *cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family*. It is not necessary to prove that the defendant had the intent to actually carry out the threat. . . ." (§ 646.9, subd. (g), italics added.)

14

### 1. Intent

It has been long recognized that " ' " ' "if a person acts similarly in similar situations, he probably harbors the same intent in each instance" [citations], and [] such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.' " [Citations.]' " (*People v. Thomas* (2011) 52 Cal.4th 336, 355-356.) The least degree of similarity is required to prove intent. (*Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403.) A prior stalking conviction is admissible to establish a defendant's intent in a subsequent stalking prosecution. (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143 (*Ogle*); see also *People v. McCray* (1997) 58 Cal.App.4th 159, 172 (*McCray*) [evidence of prior acts of violence against the victim is admissible to prove intent to place the victim in fear in a stalking and criminal threats prosecution].) Here, defendant's prior campaign of harassment and threats was similar to the current charges and clearly relevant to the determination of whether defendant intended to place the victims in fear for their safety.

### 2. The Victim's Fear[8]

As noted, the crime of stalking requires a credible threat, defined as a threat that causes the victim to reasonably fear for his or her safety or the safety of family. (§ 646.9, subd. (g).) The evidence of uncharged acts here was admissible to show the victim's fear and the reasonableness of that fear. (*Ogle*, *supra*, 185 Cal.App.4th at p. 1143 [evidence of prior harassment and a stalking conviction was admissible for the non-character

---

[8] While the trial court ruled the prior acts evidence was admissible to prove the reasonableness of the victims' fear, the court instructed the jury to only consider the prior stalking evidence as evidence tending to show defendant's intent to place the victims in fear and motive. Nevertheless, we agree the evidence was admissible to show the victim's fear and the reasonableness of that fear.

purpose of proving the victim's fear in addition to defendant's intent]; *People v. Zavala* (2005) 130 Cal.App.4th 758, 770-771 (*Zavala*) [evidence of defendant's prior assaults on the victim was admissible as germane to whether defendant's subsequent threat caused victim to be in a state of sustained fear, an element of criminal threats, and whether victim reasonably feared for her safety, an element of stalking].)

### 3. Motive

It is well-settled that where a defendant has had a prior relationship with the victim, prior assaultive behavior against the victim is admissible to establish motive. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 893; *McCray*, *supra*, 58 Cal.App.4th at pp. 171-172; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1612; *People v. Zack* (1986) 184 Cal.App.3d 409, 415.) This is because evidence showing " 'quarrels, antagonism or enmity between an accused and the victim' " is proof of motive to further victimize the victim. (*Kovacich*, at p. 893.) While this rule has been applied in domestic violence cases, it is applicable here where there is a history of harassment and threats by defendant toward the same victims. Indeed, it has been suggested that anytime " 'the motive of the crime is sought to be established before a jury, the whole conduct, life, and character of the parties as affecting this question is open to inquiry.' " (*People v. Helfend* (1969) 1 Cal.App.3d 873, 880.) Defendant's prior campaign of harassment, threats, and stalking proves his attitude towards the victims and his motive to continue that campaign. Here, the prosecutor advanced the additional theory that defendant was motivated to harass and terrorize the victims because they had been responsible for his prior conviction. (See *Kelley*, *supra*, 52 Cal.App.4th at pp. 578-579 [prior conviction for molestation was admissible in a stalking prosecution because it established defendant's attitude toward the victim's testimony and was relevant to show a motive to place the victim in fear].) The evidence supports that additional theory as well.

16

### 4. Evidence Code section 352 Analysis

Defendant argues the trial court abused its discretion in allowing the prior misconduct evidence, because the court did not conduct the " 'closely reasoned' " weighing process mandated by Evidence Code section 352, and the prejudicial effect of the prior acts evidence outweighed any probative value. We disagree.

First, the trial court carefully explained its reasoning and its consideration of the various pertinent factors. The court expressly found that the uncharged conduct was similar enough to establish defendant's intent. The court further found the evidence was necessary to complete the picture of the relationship between defendant and the victims. The court ruled that the evidence was also probative of the victims' fear and the reasonableness of that fear and defendant's motive. And the court expressly found that the evidence was "not particularly inflammatory," was not remote, and "should not take up an exorbitant amount of time." We see no deficiency in the trial court's analysis.

Second, defendant fails to show the weighing of probative value against prejudice was so unbalanced as to compel exclusion of the evidence. He argues that the overwhelming amount of prior misconduct evidence served an "improper" purpose of proving propensity to commit the charged crimes and to show that his defense (that his conduct was just rude and offensive, not criminal) lacked merit. However, the evidence was not used to prove propensity. The jurors were instructed that they could consider the prior acts evidence only for the limited purpose of deciding whether or not defendant acted with the intent to place the victims in reasonable fear for their safety, and whether defendant had a motive to commit the offenses alleged in the current case. We presume they followed the instruction. (*People v. Anzalone* (2013) 56 Cal.4th 545, 557.)

Additionally, defendant misperceives the meaning of prejudicial effect under Evidence Code section 352. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46

17

Cal.3d 612, 638.) Rather, Evidence Code section 352 uses the word "prejudice" in its " 'etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*Ibid*.) Here, the "prejudice" naturally flowed from the relevant, highly probative evidence of defendant's prior harassment.

Defendant argues the prior conduct evidence was too extensive, with too much detail of numerous incidents. We note that defendant did not say in the trial court what specific evidence should have been excluded. Consequently, he has forfeited this argument. When making an Evidence Code section 352 objection grounded upon the existence of an evidentiary alternative, the requirement in section 353, subdivision (a),[9] to state specific reasons for an objection requires the objecting party to identify the evidentiary alternative with specificity. (*People v. Holford* (2012) 203 Cal.App.4th 155, 170.) A trial court's section 352 analysis requires a weighing of the probative value of the evidence against the prejudicial effect and unless the evidentiary alternative is identified with specificity, the probative value of that evidentiary alternative is not known and cannot be factored into the analysis. (*Ibid*.) Moreover, this is not a case where the evidence was "merely cumulative regarding an issue that was not reasonably subject to dispute." (See *Ewoldt*, *supra*, 7 Cal.4th at p. 406 [suggesting that the prejudicial effect of evidence of other acts of misconduct would outweigh the probative value when the evidence would be merely cumulative regarding an issue that was not reasonably subject to dispute].) Here, defendant's intent and motive were in active dispute; thus, the evidence was highly probative.

---

[9] Evidence Code section 353 provides in part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

On appeal, defendant argues the trial court should have excluded evidence that the victims saw defendant punch the neighbor and saw the police remove guns from defendant's home. However, assuming defendant did not forfeit the point by failing to object to this evidence as outside the scope of the trial court's in limine ruling, defendant fails to show error. The evidence was clearly relevant and probative to establish the victims' fear of defendant, and the reasonableness of their fear.

Defendant also claims the evidentiary ruling violated his constitutional rights to due process and a fair trial. However, defendant did not present a constitutional claim in the trial court. Therefore, defendant's constitutional claim on appeal is limited. Defendant may argue for first time on appeal that the asserted evidentiary error had the legal consequence of violating due process, but our rejection on the merits of defendant's claim of evidentiary error under the statute necessarily leads to rejection of newly raised constitutional gloss as well. (See *People v. Partida* (2005) 37 Cal.4th 428, 436-439.) "[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*Jones*, *supra*, 57 Cal.4th at p. 957.)

Here, defendant fails to show a statutory violation, hence his constitutional claims also fail.

## II. Duplicative Stalking Counts

Defendant contends counts two and four, stalking Hunter and Tara in violation of a restraining order (§ 646.9, subd. (b), *ante*, fn. 1), must be vacated because they are duplicative of counts one and three, stalking Hunter and Tara while having a prior stalking conviction (§ 646.9, subd. (c)(2)). The People agree, as do we.

In *People v. Muhammad* (2007) 157 Cal.App.4th 484 (*Muhammad*), the court held that subdivisions (b) and (c) of section 646.9 (see, *ante*, fn. 1) do not define separate substantive offenses with separate elements of an existing restraining order or prior conviction. Instead, subdivision (a) of the statute sets forth the elements of the crime of

19

stalking, while subdivisions (b) and (c) "are penalty provisions triggered when the offense of stalking as defined in subdivision (a) of that section is committed by a person with a specified history of misconduct." (*Muhammad*, at p. 494; see also *People v. Markley* (2006) 138 Cal.App.4th 230, 244 [§ 646.9, subd. (c)(2), provides "*alternative sentencing scheme*" if defendant has previous stalking conviction].) The *Muhammad* court noted that, unlike an enhancement, which is an additional term of imprisonment added to a base term, " ' "[a] penalty provision prescribes an added penalty to be imposed when the offense is committed under specified circumstances. A penalty provision is separate from the underlying offense and does not set forth elements of the offense or a greater degree of the offense charged. [Citations.]" ' " (*Muhammad*, at p. 492.) The court in *Muhammad* ordered the convictions and sentence on the duplicative counts vacated. (*Id*. at pp. 494-495.)

Here, defendant committed the crime of stalking Hunter and Tara in violation of a restraining order (counts two and four) after being previously convicted of stalking Hunter and Tara (counts one and three). The trial court imposed sentence on all four counts but stayed execution of sentence on counts two and four under section 654.

We conclude the convictions on counts two and four must be vacated and the sentences stricken.

### III.  Violation of a Restraining Order - Section 654

Defendant claims, without any citation to the record, that the trial court sentenced him to "time served" for count five, misdemeanor violation of the restraining order (§ 166, subd. (a)(4)[10]). Defendant contends we must order this sentence stayed under section 654,[11] because the misdemeanor was incidental to the stalking counts.

_____

[10]  Section 166 provides in part:  "(a) Except as provided in subdivisions (b), (c), and (d), a person guilty of any of the following contempts of court is guilty of a misdemeanor:

20

The People respond the trial court did not sentence defendant at all on count five, and we should reject defendant's contention as moot.

The abstract of judgment makes no mention of the count five misdemeanor. In any event, it is the oral pronouncement which constitutes rendition of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) The reporter's transcript shows that, after the trial court sentenced defendant on counts one through four, the court stated, "And as to Count Five, I order that there be no additional time for Count Five." The court minutes similarly states, "NO ADDITIONAL TIME IS IMPOSED" for count five.

The words "no additional time" are arguably ambiguous, because they could mean no time in addition to the time served, or no time in addition to the sentences imposed on counts one through four.

Section 166, subdivision (b)(1), provides, "A person who is guilty of contempt of court under paragraph (4) of subdivision (a) by willfully contacting a victim by telephone or mail, or directly, and who has been previously convicted of a violation of Section 646.9 [stalking] shall be punished by imprisonment in a county jail for not more than one year, by a fine of five thousand dollars ($5,000), or by both that fine and imprisonment."

The trial court did not impose a fine. Therefore, we apply the statutory presumption that official duty was regularly performed (Evid. Code, § 664), and we construe the trial court's reference to "no additional time" to mean no time in addition to the time served, which was 309 actual days. (§ 12 [trial court has duty to pass sentence

---

[¶] . . . [¶] (4) Willful disobedience of the terms as written of any process or court order or out-of-state court order, lawfully issued by a court, including orders pending trial."

[11] Section 654 provides in part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

and impose punishment after conviction]; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468 (*Alford*) [trial court must sentence defendant or grant probation].)

Defendant argues that, because the conduct violating the protective order was incidental to the conduct violating the stalking statute, section 654 requires that sentence for the misdemeanor must be stayed. The People respond that defendant's contention is moot, because defendant is asking us to stay a sentence he has already served or will never have to serve. Defendant replies the matter is not moot because any sentence, time served or not, remains part of his criminal record and could result in a harsher sentence if he re-offends, depending on the state of recidivist statutes at that time, and could affect immigration status.[12] Defendant argues we should consider the matter even if moot, because it is capable of repetition yet evading review.

We conclude the matter is not moot, and the trial court should have stayed the execution of the misdemeanor sentence under section 654.

Section 654 proscribes multiple punishment where all offenses were incidental to one objective. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363.)

The People do not argue that defendant had a different objective from harassing the victims when he violated the restraining order.

Where a felony and misdemeanor fall within the purview of section 654, the trial court may satisfy the statute by sentencing on the greater offense and granting credit for time served on the lesser misdemeanor charge. (*People v. Crowder* (2000) 79 Cal.App.4th 1365, 1370-1371.)

When section 654 applies, however, the sentence for the lesser conviction must be imposed and execution stayed, not ordered to run concurrently or consecutively. (*People*

---

[12] The record does not indicate that defendant is subject to immigration consequences.

*v. Deloza* (1998) 18 Cal.4th 585, 594; *Alford*, *supra*, 180 Cal.App.4th at pp. 1468-1469.) A stayed sentence may be executed if there is a reversal of the unstayed count. (*Alford*, at p. 1469.) But, short of a reversal, there can be no punishment for a sentence stayed pursuant to section 654.

Thus, the trial court erred by implicitly ordering execution of a 309-day sentence (time served) for the misdemeanor violation of the restraining order.

The judgment is modified to show a 309-day sentence was imposed for the misdemeanor, but execution of the sentence was stayed pursuant to section 654.

## IV. Presentence Credits

Defendant was arrested on August 17, 2011. At the sentencing hearing on June 29, 2012, the trial court awarded him a total of 463 days of credit -- 309 actual days in presentence custody, plus 154 days of local conduct credit under section 4019. Defendant contends he was entitled to day-for-day conduct credits under the version of the statute governing the calculation that was in effect as of the date of his arrest. The People agree, and we accept their concession.

A sentence that fails to award legally-mandated custody credit is unauthorized and may be corrected whenever discovered. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)

Stalking is a crime requiring a continuous course of conduct. (§ 646.9, subd. (e); *Zavala*, *supra*, 130 Cal.App.4th at p. 769.) A continuous course of conduct offense cannot logically be completed until the last requisite act is performed. (*People v. Palacios* (1997) 56 Cal.App.4th 252, 257 [where offense is continuing in nature and the conduct continues after enactment of a statute, application of the statute does not violate the ex post facto clause].)

The pleading alleged the stalking occurred between October 3, 2009, and August 16, 2011. According to the testimony, the last act occurred on August 16, 2011, and defendant was arrested on August 17, 2011. Defendant is entitled to day-for-day

conduct credits under the statutory provisions in effect from September 2010 to October 2011. Effective September 28, 2010, through October 1, 2011, defendants sentenced to prison received one day of presentence conduct credit for each day of actual presentence confinement served. (*People v. Garcia* (2012) 209 Cal.App.4th 530, 537-539; Stats. 2010, ch. 426, §§ 1-2.) Prisoners were disqualified if the current offense was a serious felony, or they had a prior serious or violent felony conviction or were required to register as a sex offender. (*Ibid*.; Stats. 2010, ch. 426, §§ 1-5.) Stalking is not listed as a violent or serious felony offense (§§ 667.5, subd. (c), 1192.7, subd. (c)) and defendant is not a section 290 registrant. Thus, none of the disqualifying factors applies to defendant.

We order correction of the judgment to show 309 days in custody, plus 309 days of conduct credit, for a total of 618 days of credit.

## DISPOSITION

The convictions on counts two and four are vacated and the sentences stricken. The judgment is modified as to count five, violation of section 166, subdivision (b)(1), to reflect imposition of a sentence of time served, execution stayed pursuant to section 654. The judgment is further modified to show 309 days of presentence custody plus 309 days of conduct credits, for a total of 618 days of credits. The trial court shall prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

The judgment is otherwise affirmed.

<u>   MURRAY   </u>, J.

We concur:

<u>  RAYE    </u>, P. J.

<u>  BLEASE   </u>, J.