[No. D044321. Fourth Dist., Div. One. June 27, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO GONZALEZ ZAVALA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

COUNSEL

Ward Stafford Clay and Brian P. Hochvert for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Pamela A. Ratner Sobeck, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McDONALD, J.**—A jury convicted appellant Mario Gonzalez Zavala of one count of stalking (Pen. Code, § 646.9, subd.(a),[2] count one) in connection with his conduct toward his former wife, Alicia Zavala (Wife), between July 11 and August 29, 2003, and one count of misdemeanor child abuse (§ 273a, subd. (b)) in connection with his conduct toward his daughter during the same period.[3] Zavala argues there is insufficient evidence to support the stalking conviction, and the court committed instructional and evidentiary errors requiring reversal of the stalking conviction. Zavala also asserts there is insufficient evidence to support the misdemeanor child abuse conviction.

---

[2] All statutory references are to the Penal Code unless otherwise specified.

[3] Zavala was also charged misdemeanor child abuse (§ 273a, subd. (b)) in connection with his conduct toward his son during the same period, and with making a criminal threat against Wife on August 7, 2003 (§ 422, count two). The jury acquitted Zavala of these charges.

I

## FACTUAL BACKGROUND

### A. *Prosecution Case*

*Background*

Zavala and Wife were married in 1989. However, they separated in 1991 after a domestic violence incident prompted Wife to obtain a temporary restraining order against him, and they were divorced in 1992. At the time of their divorce, they had one daughter (Daughter). Zavala and Wife subsequently reconciled and they resumed living together without remarrying, and had a second child together. In the first part of 2003, the family lived together at 1262 Waxwing Lane in Chula Vista (the home).

*Prior Uncharged Acts*

On Easter Sunday of 2002, Zavala (who had been drinking) threw a plate at Wife. When she asked him what was wrong, he grabbed her arm, called her a "stupid bitch," and said he hated "living like this." The force of his grab ripped her shirt and bruised her arm, and caused several drinking glasses to fall to the floor and break.

On June 17, 2003, Daughter overheard Zavala and Wife arguing in the kitchen. When Daughter came to the kitchen, she saw Zavala's hands around Wife's throat. Zavala caused Wife to cough and lose her breath, and Wife thought Zavala was trying to choke or kill her. Daughter returned to her room and started crying. Zavala followed her and tried to explain his unhappiness with the relationship between him and Wife.

Two days later, after Wife returned from taking her children to school, Zavala was angry and spit food at Wife, and challenged her by asking what she was going to do about it. She was shocked and scared and left the home. That afternoon, Wife returned to the home with her children. Zavala confronted Wife and accused her of stealing money from him. Zavala called Wife into the bedroom, where he again accused Wife of stealing money. He grabbed Wife's arm, squeezing and jerking it back and forth with enough force to cause bruising, while putting his other fist up to her face. Zavala angrily asked Daughter if she stole the money; Wife denied Daughter would steal from him. Zavala then grabbed his pocketknife, and used it to gesture

toward Wife's sport utility vehicle parked outside, and stated, "Well, you're not going anywhere. That's my car, and you're not going to take off in it." Zavala then walked outside carrying the knife. A short while later, he came back inside and put the knife away. He told Daughter, "If you had any part of this I'm really going to be upset." Wife went outside and saw two of the tires had been deflated. At some point, Daughter or Wife called 911 but hung up. Police responded to the 911 hang-up call, and saw the two front tires had been deflated. Wife showed police the bruises on her arm, and told them she was afraid of her husband and scared for her children, and that Zavala kept guns and a knife in the home. Police found four or five rifles, two handguns and a knife inside the home, and removed the weapons. Wife took the children with her to her parents' house, where they stayed that night.

On June 20, 2003, Wife obtained a temporary restraining order and an order for Zavala's removal from the home.

### The Stalking Offense

On July 11, at approximately 4:00 a.m., Wife was at home when she was awakened by the sound of Zavala's car engine. She looked outside and saw Zavala's car, a white Porsche, parked in the yard. She called police because she did not know what he was going to do. However, after sitting in the car for a while, Zavala left.

On the morning of August 2 Wife received more than 20 telephone calls. In many of the calls, no one spoke but Wife heard noise in the background. In several other calls, Zavala spoke to Wife, stating words to the effect of "you stupid bitch, you fucked up, you fucked up again." Wife again contacted police.

On August 3, Wife was packing her car with supplies for a planned trip to the beach to celebrate her son's birthday. Zavala unexpectedly drove up and stopped at the driveway of the home. Wife told Daughter to run inside and call the police. Wife stood in the doorway to block Zavala's entry and told him to leave. Zavala said, "Fuck you, bitch," and pushed past Wife and entered the home. Once inside, he politely wished his son happy birthday, and began yelling Daughter's name. Daughter, who had already telephoned police, told Zavala he should leave. Zavala responded that he was not going to leave, and he could not believe Daughter was "backstabbing" him. Daughter began to cry, and Zavala finally left. When police arrived, Wife (who was shaky and scared) and Daughter told police what had happened and that they feared Zavala.

The following evening at approximately 8:00 p.m., Zavala drove past the home while Wife was outside. They made eye contact, and Wife went inside and locked the doors. A short time later, Wife and the children were inside when she saw Zavala walking up the driveway. Daughter immediately went to call the police. Zavala confronted Daughter before leaving. Wife feared Zavala would return and was afraid for her safety.

The following morning, August 5, Zavala telephoned Wife around 9:00 a.m. and stated, "You fucked up, bitch. You had everything, you had everything and you fucked up." He then hung up. Wife was afraid and called her divorce attorney, but she declined her attorney's recommendation to call police because it was just a telephone call. However, around 11:00 a.m., as Wife drove away from her home with her son, she saw Zavala parked on a street near her home. Zavala followed her to a shopping center, and Wife called police on her cellular telephone during the drive, but Zavala broke off contact before police arrived. At 11:00 p.m. that night, Wife was inside the home when she heard Zavala's car engine; she looked out and saw him next to his car in the driveway of the home. After a few minutes, he drove away. She telephoned police and told them she was scared of what he might do to her.[4]

At approximately 5:00 p.m. the following day, Wife and the children were at Wife's parents' home, having spent the previous night there because of the incident the previous evening. Daughter came inside, crying, "He's here, he's here, he's doing it again," and Wife looked outside and saw Zavala sitting in his car. Wife called 911. An officer monitoring traffic a block from the parents' house saw a white Porsche drive past him shortly after he heard the radio broadcast of the restraining order violation.

The next day, August 7, Wife was still at her parents' home. Zavala called her cellular telephone multiple times, telling her she was a "stupid bitch." He also told her, "I'm going to kill you, just watch," and told her the children would be better off with a foster parent than with her. He concluded, "The next time they see me I'll be behind a glass wall." Wife reported these calls to police, and police responded. While police were at the house, her cellular telephone rang, and Wife gave it to a deputy, who heard a male voice on the other end of the line. When the deputy said "Hi Mario," the person said, "Stop calling me" and hung up. About 20 minutes later, the telephone again

---

[4] An officer observed Zavala in the vicinity of the home and detained him. Zavala denied being at the home and claimed he was merely visiting a friend. Police arrested Zavala but he apparently was released shortly after his arrest.

rang, and Wife answered, heard Zavala's voice, and again gave the telephone to the deputy, who again said, "Hi Mario." The voice replied, "Yeah," and the deputy told Zavala this was the second time Zavala had called and that Zavala was violating the restraining order. Zavala again replied, "Stop calling me" and hung up.

After a few days of respite, Zavala on August 13 again made multiple calls to Wife, leaving voice messages laced with vulgarities and calling Wife a "bitch" and threatening to kill her. During this time, Wife was taking precautions for her safety, including staying at her parents' house, keeping her windows closed at night, and going around the block to make sure Zavala was not in a position to intercept her before she could get inside the home.

On the morning of August 15, Wife returned home (after again having slept at her parents' house) and found the security alarm beeping. She discovered wire cutters had been taken from a tool chest and were on a worktable. The power to the residence was off, the wires to the garage door opener had been cut, an off-road vehicle was missing from the garage, and Wife's motor home (parked in the back) had been vandalized. Later that evening, Wife was waiting near the home with her sister and children when they saw Zavala (accompanied by his father) arrive at the home in the father's pickup truck. Zavala jogged to the front door, while Zavala's father backed the truck up to the garage. However, when Zavala's father saw Wife, he yelled to Zavala, who quickly returned to and got inside the truck. As the truck passed by Wife, Zavala waved and smiled at Wife and the children. Wife was afraid and reported the incident to police.

On August 29, Wife went to the Chula Vista Police Department to meet with a detective about the case against Zavala, and signed the visitors log at approximately 1:10 p.m. The detective later found that Zavala's name appeared in the visitors log with a time of 3:00 p.m. next to it.

*The Misdemeanor Child Abuse Offense*

Daughter suffered emotional anguish as a result of witnessing Zavala's harassing behavior directed toward Wife and because she feared he might harm Wife. Additionally, during the August 3 incident, when Daughter came to her mother's aid by calling the police, Zavala yelled Daughter's name, demanding that she face him. When Daughter told him to leave, he refused; instead, he accused her of "backstabbing" him and reduced her to tears.

During the August 4 incident, when Zavala made an evening appearance at their home, Daughter again was the one who called the police. Zavala, appearing very angry, shouted through the window and demanded that Daughter talk to him. When Daughter came out of her room, Zavala asked if she had called the police. When she admitted she had, he again accused her of backstabbing him.

### B. *The Defense*

On August 15, 2003, when Wife was interviewed by a Chula Vista police officer, she stated she did not believe Zavala was capable of killing her. During a November 2003 conversation with a family friend, Wife stated she was fine, and was calm and happy because she could do what she wanted without anyone telling her what to do.

## II

## THE STALKING CONVICTION

### A. *Sufficient Evidence Supports the Verdict*

Zavala contends the evidence was insufficient to support a conviction of stalking under section 646.9. He argues (1) the prosecution did not satisfy the harassment element of stalking because there was no evidence Wife suffered substantial emotional distress and (2) there was insufficient evidence Zavala made a credible threat of death or great bodily injury to Wife.

*Standard of Review*

In reviewing a claim of insufficient evidence, we review the record in its entirety, considering the evidence most favorably to the prevailing party, and determine whether any rational trier of fact could have found the prosecution proved its case beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) We do not sit as the trier of fact and determine whether the evidence proves guilt beyond a reasonable doubt. Rather, we determine if substantial evidence supports the conclusion of the trier of fact. (*Ibid.*) Substantial evidence is evidence that is reasonable, credible and of solid value (*id.* at p. 578), and the testimony of a single witness is sufficient evidence to support the verdict. (*People v. Chavez* (1985) 39 Cal.3d 823, 831 [218 Cal.Rptr. 49, 705 P.2d 372].)

*Analysis*

To commit the offense of stalking, a defendant must "willfully, maliciously, and repeatedly [follow] or willfully and maliciously [harass]

another person and . . . [make] a credible threat with the intent to place that person in reasonable fear for his or her safety . . . ." (§ 646.9, subd. (a); see *People v. Ewing* (1999) 76 Cal.App.4th 199, 210 [90 Cal.Rptr.2d 177].) The term "harass" is statutorily defined as a course of conduct that "seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) The "credible threat" element is statutorily defined as a threat "made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety . . . ." (§ 646.9, subd. (g).)

The record shows that, notwithstanding the restraining order, Zavala repeatedly contacted Wife in person and by telephone, followed her on at least three occasions, and made various express or implied threats against her. Zavala argues there was no evidence Wife was "seriously" alarmed or terrorized by his conduct, because she merely testified she feared he might harm her. Wife's direct testimony of her fear of Zavala, coupled with spending nights at her parents' house because of her fear of Zavala, circling the home to make sure Zavala was not present to prevent her from entering the home safely, and locking the windows on hot summer nights to protect against his intrusion, provides evidentiary support for the finding Zavala's conduct seriously alarmed, annoyed, tormented, or terrorized her.

■ Zavala also asserts there was no credible threat that caused Wife to reasonably fear for her safety (§ 646.9, subd. (g)) because there was no evidence Zavala threatened Wife with death or great bodily injury, as required by *People v. Carron* (1995) 37 Cal.App.4th 1230, 1235–1237 [44 Cal.Rptr.2d 328]. However, *Carron* interpreted a prior version of the statutory definition for "credible threat" (*id.* at pp. 1236–1237), and subsequent statutory amendments have modified the "credible threat" element to require that the target of the threat need only fear for the target's safety or that of his or her family while deleting any requirement that the threat be "against the life of, or [threaten] great bodily injury to" the target. (See Stats. 1994, ch. 931, § 1, p. 5398.) Moreover, there was substantial evidence Zavala threatened to kill Wife, which would satisfy the requirements even under the prior statute.[5]

---

[5] Zavala's argument is that there was no death threat because the death threat described by Wife as occurring on August 7 was the subject of a separate count (count two), on which Zavala was acquitted, and therefore that evidence necessarily was rejected by the jury and cannot be considered on whether there was a credible threat under count one. Even assuming the conviction on count one was inconsistent with the jury's action on count two, "[i]t is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] [¶] . . . [¶] An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*People v. Lewis* (2001) 25 Cal.4th 610, 656 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Because section 954 specifies that "[a]n acquittal of one or more counts shall not be deemed an acquittal of any other count," the courts have upheld a conviction on one count even though it might have been inconsistent with acquittals on other

Zavala finally argues there was no evidence he had the "apparent ability" to carry out the threat because he presented character witnesses vouching for his peaceful nature, and Wife told an officer she did not believe Zavala would kill her. However, Zavala's violent character *toward Wife* was demonstrated by the Easter 2002 assault on Wife, as well as the June 17, 2003 choking incident, and her belief that he might not be capable of *murder* did not exclude a reasonable belief that he was capable of violently assaulting her.

### B. *No Unanimity Instruction Was Required*

Zavala argues the trial court erred by not sua sponte giving the unanimity instruction (CALJIC 17.01) because there was a series of discrete events that could have formed the basis for the jury's verdict that Zavala was guilty of following or harassing Wife in violation of the stalking statute, thereby raising the danger that the jury did not unanimously agree on Zavala's guilt. (*People v. Sutherland* (1993) 17 Cal.App.4th 602, 611 [21 Cal.Rptr.2d 752].)

The requirement of unanimity as to the criminal act is intended to eliminate the danger the defendant will be convicted even though there is no single offense all the jurors agree the defendant committed. For example, in *People v. Diedrich* (1982) 31 Cal.3d 263 [182 Cal.Rptr. 354, 643 P.2d 971], the defendant was convicted of a single count of bribery, but the evidence showed two discrete bribes. The court held the absence of a unanimity instruction was reversible error because without it, some of the jurors may have believed the defendant guilty of one of the acts of bribery while other jurors believed him guilty of the other, resulting in no unanimous verdict that he was guilty of any specific bribe. (*Id.* at pp. 280–283.)

There is a well-established exception to the unanimity instruction requirement in cases in which the defendant is charged with violating a statute by a continuous course of conduct. For example, in *People v. Ewing* (1977) 72 Cal.App.3d 714 [140 Cal.Rptr. 299], the defendant was charged with inflicting great bodily injury on a child between "July 1, 1975, and November 10, 1975." (*Id.* at p. 717.) The evidence showed the child had suffered "scratches, scalds, burns and bruises" during this period. (*Id.* at p. 716.) The evidence also showed that when the child was brought to the hospital on November 10, 1975, doctors discovered he had suffered "three separate subdural hematomas, one of which proved fatal." (*Ibid.*) Under these

counts (see *People v. Codina* (1947) 30 Cal.2d 356, 360–361 [181 P.2d 881] [conviction for lewd conduct with a child upheld despite acquittal on separate count charging contributing to delinquency of child]) or on enhancement allegations (see *People v. Brown* (1989) 212 Cal.App.3d 1409, 1421 [261 Cal.Rptr. 262] [conviction for assault with firearm upheld despite negative finding on section 12022 arming allegation], disapproved on other grounds in *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10 [276 Cal.Rptr. 874, 802 P.2d 376]).

circumstances, *Ewing* held: "Here, the information alleged a course of conduct in statutory terms which had occurred between two designated dates. The issue before the jury was whether the accused was guilty of the course of conduct, not whether he had committed a particular act on a particular day. The instruction requiring jury unanimity as to particular acts was inappropriate. Its omission was not error." (*Id.* at p. 717.)

■ The *Diedrich* court recognized the continuous crime exception to the unanimity instruction requirement applies to two types of offenses: where the statutory offense contemplates a continuous course of conduct by a series of acts over a period of time (see, e.g., *People v. Vargas* (1988) 204 Cal.App.3d 1455, 1462–1464 [251 Cal.Rptr. 904] [continuous course of conduct doctrine applied to child abuse occurring over 10-day period]), or those crimes consisting of acts so closely connected in time or location to form a single transaction. (*People v. Diedrich, supra,* 31 Cal.3d at p. 282.) In those cases, there is no need for a unanimity instruction as to individual acts within the course of conduct, because the jury need only agree on whether the defendant committed acts the net effect of which constitutes the statutory offense. (*People v. Vargas, supra,* 204 Cal.App.3d 1455.)

■ The statutory offense here is self-defined to require a course of conduct. (§ 646.9, subd. (e) [" 'harasses' means engages in a knowing and willful course of conduct"].) Because Zavala was charged with a "course of conduct" offense occurring over a period of time, we conclude that the continuing course of conduct doctrine applies and, therefore, no unanimity instruction was required. (Cf. *People v. Napoles* (2002) 104 Cal.App.4th 108, 116 [127 Cal.Rptr.2d 777].)

### C. *The Trial Court Correctly Rejected Zavala's Proffered Instruction*

The trial court rejected Zavala's proposed special instruction, submitted in connection with the stalking count, which read: "In order to be found guilty of the crime of [stalking], the prosecution must prove beyond a reasonable doubt that the victim must have actually *feared death or great bodily injury* as a result of the threat and that fear must be reasonable." (Italics added.)

■ Zavala argues the court erroneously rejected this instruction. It is not error to reject a legally incorrect instruction. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1079 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) ■ The statutory amendments have eliminated the former requirement that the threat be "against the life of, or [threaten] great bodily injury to" the target (See Stats. 1994, ch. 931, § 1, p. 5398), and the statute now requires that the target fear only for the target's (or his or her

family's) safety. The italicized language made the proffered instruction legally incorrect and it was properly rejected by the trial court.

### D. *The Prior Violent Acts Issues*

Zavala finally argues the trial court erroneously admitted evidence of his prior violent acts toward Wife, and then misinstructed the jury on the proper use for which that evidence could be considered.

#### *The Admissibility Issue*

■ Although Evidence Code section 1101, subdivision (a) makes inadmissible (subject to enumerated exceptions) evidence of prior violence toward the victim when offered to prove the defendant's disposition to commit the charged offense, it does not preclude such evidence when it is relevant to other disputed issues. In *People v. Garrett* (1994) 30 Cal.App.4th 962 [36 Cal.Rptr.2d 33], the defendant was charged with making a criminal threat against the victim (§ 422), the same statutory violation charged against Zavala in count two of the information. The court recognized that because the prosecution was required to show both the defendant's intent that his words be taken as a threat, and that the threat caused the victim to be in a state of "sustained fear" for her safety, evidence of the defendant's prior assaults on the victim was admissible as "thoroughly germane to these issues" and did not offend Evidence Code section 1101. (*Garrett,* at pp. 966–968.) *Garrett* is directly controlling insofar as the evidence was admitted on these issues as to count two, and we are persuaded by *Garrett* that it was also admissible on the stalking count because an element of that offense (similar to the criminal threat offense) requires proof the victim reasonably feared for her safety. There was no error in admitting the evidence.

#### *The Instructional Issue*

■ Zavala argues the trial court erred when it instructed the jury on the use of the prior violent acts evidence.[6] Zavala notes that Evidence Code section 1109 is a limited exception to the general ban (under Evid. Code, § 1101) against using prior acts to infer the defendant's disposition to commit the charged acts, and permits such evidence as the basis for such inference if the defendant is accused of a crime involving domestic violence within the meaning of section 13700. (See Evid. Code, § 1109, subd. (d).) Zavala asserts

---

[6] The court instructed "If you find by a preponderance of the evidence that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit offenses involving domestic violence. [¶] If you find that the defendant had this disposition, you may, but are not [required to,] infer that he was likely to commit and did commit the crime or crimes [charged] in counts one and two."

that, to the extent the stalking offense does *not* require that the threat induced the victim to fear great bodily injury or death, stalking is concomitantly *not* a crime of domestic violence (as defined by section 13700) and therefore the prior violent acts evidence may not be used by the jury to infer Zavala had a disposition the type of which made it likely he committed the stalking offense.

We agree it was error to give the instruction as to the count charging Zavala with stalking. However, we are also convinced it is not reasonably probable Zavala would have obtained a more favorable result absent the instruction, and therefore the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (Cf. *People v. Crandell* (1988) 46 Cal.3d 833, 870 [251 Cal.Rptr. 227, 760 P.2d 423], disapproved on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365 [121 Cal.Rptr.2d 580, 48 P.3d 1136] [applying *Watson* standard to erroneous instruction on permissible inferences from trial evidence].) First, the jury's acquittal of Zavala on count two shows it carefully weighed and considered the evidence of his guilt independent of the inference permitted by the instruction. More importantly, the evidence of Zavala's *acts* (e.g. repeatedly contacting her in person and by telephone between July 11 and August 29, 2003, notwithstanding the restraining order) was corroborated by numerous witnesses, including Daughter and investigating police officers. Thus, it appears (as to the stalking offense) the only issue in substantial dispute was whether Wife actually feared for her safety, or was instead exaggerating or lying about her alleged fear to obtain a conviction that would provide her an advantage in the looming child custody battle. Although the erroneous instruction had tangential relevance to the issue of what *acts* Zavala may have committed, it was almost entirely irrelevant to the central disputed issue—Wife's state of mind—and therefore it is not reasonably likely Zavala would have obtained a more favorable result absent the instruction.

III

THE MISDEMEANOR CHILD ABUSE CONVICTION[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 758.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Huffman, J., concurred.