Filed 7/20/16  P. v. Martinez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN MANUEL MARTINEZ,<br><br>    Defendant and Appellant. | C075035<br><br>(Super. Ct. No. CRM13-2101) |

A jury found defendant Juan Manuel Martinez guilty of stalking and violating a court order (Pen. Code, § 646.9, subd. (b)),[1] two counts of contempt of court by contacting persons protected by a court order (§ 166, subd. (c)(1)), and violating a protective order (§ 273.6, subd. (a)).  The trial court sentenced defendant to an aggregate

---

[1]     Undesignated statutory references are to the Penal Code.

1

term of four years four months in state prison.  On appeal, defendant contends there was insufficient evidence to sustain any of his convictions.  We affirm.

BACKGROUND

*A.  Defendant and Irma's Marriage*

Defendant and Irma Martinez were married for 15 years.  They lived in Winters, California, with their three children.  During their marriage, defendant was a drug addict and he refused to get treatment for his addiction.  In October 2012, the trailer in which they were living was rendered uninhabitable by a fire.  Irma and the children moved in with Irma's parents, without defendant.

Between December 2012 and April 2013, Irma drove by the trailer every day on her way to work and could see that defendant was living in the trailer.  In March 2013, Irma filed for a divorce.

*B.  Mariani Nut Company*

Between 2005 and early 2011, defendant did seasonal work for the Mariani Nut Company (Mariani).  Irma worked for Mariani consistently for approximately 18 years.  Depending on Mariani's needs, Irma would be sent to work at any one of Mariani's multiple properties in Winters.  During "nut season," Irma worked primarily at the Dutton facility.  If there was a problem with almonds, Irma would go to the Buckeye facility.  If there was a problem with a full-time employee, Irma would report either to the East Baker Street office or the Edwards Street office.  If there was an employee meeting or a personnel problem with a temporary employee, she would go to the Abbey Street office (the Abbey office).

The Abbey office is a three- or four-minute walk from the Dutton facility and three blocks from the Baker facility; mandatory safety meetings are held at the Abbey office twice a month for all Mariani employees.  In addition, Horizon Personnel Services (Horizon) is located in the Abbey office.  Horizon is the only employment agency that recruits and hires employees for Mariani; they do not recruit or hire for any other

employer from that location.[2]  Outside the front door to the Abbey office is a sign which reads "Horizon Personnel Services" and another "big banner" next to the office with the Mariani logo on it.  There is also a board outside the office that says Horizon hires for Mariani and a separate board outside the adjacent buildings, which reads "Mariani Nut Company."

### C.  Defendant's Conduct and Resulting Restraining Orders

After Irma moved in with her parents, defendant began threatening her; he told her the brakes could fail in her car or her parents' car.  Between October 2012 and January 2013, defendant showed up daily at the Mariani facility on Dutton Street in order to find Irma.  Irma's coworker, Josefina Tobar, saw that defendant would wait for Irma by her car and would sometimes get into Irma's car even after Irma told him not to.  Other times, Josefina's husband would drive Josefina and Irma home from work because defendant would tell Irma that he would see her "on the way out" of work.

Defendant went to Irma's parents' house day and night, knocking on her window and refusing to leave.  Defendant called Irma "[a] lot"; if Irma did not answer her phone, defendant would go looking for her.  Irma told defendant to stop coming to the house and to stop calling.  Irma's father also told defendant to stop coming to the house.  One of defendant and Irma's sons even called the police.  But defendant continued to show up and continued to call.

Irma was afraid of defendant.  To protect herself she sought a restraining order against him and received permission from Mariani to park her car inside the Mariani facilities when she worked at night.  A "temporary restraining order" against defendant was issued on January 17, 2013, (January 17 DVRO) and a hearing was set on

---

**2**    Horizon hires temporary employees who then become full-time employees depending on production needs.  If a full-time position was available and someone wanted to apply for that position, he or she would go to the Baker facility.

February 4, 2013, for a permanent restraining order. Defendant was not immediately served with the January 17 DVRO.

On January 22, 2013, when Irma picked up one of their children from school, defendant was at the school. Defendant got into Irma's car uninvited. Not wanting to fight in front of the child, Irma drove defendant to their uninhabitable trailer where defendant was living, but he refused to get out of the car. Defendant demanded Irma take him to her parents' house but she refused. Eventually, defendant got out of Irma's car and tried to remove the air from the tires. Irma then got out of the car, handed her phone to their son and told him to call the police, which he did. Defendant went inside the trailer, retrieved a bottle of wine, and poured the wine on Irma's car. Defendant then went back to the trailer and held up a lighter. Irma and her son were afraid that defendant was going to set the car on fire with them inside.

On January 25, 2013, defendant approached Irma as she was walking toward her car after work. Irma told defendant he could not be there that she had a restraining order against him. She told defendant to leave or she would call the police. Then, as she reached for her phone, defendant lunged at Irma, struggled with her, and took her phone. Irma shouted to a coworker to call the police. Yolo County Sheriff's Deputy Matthew Marton soon arrived and arrested defendant. Deputy Marton also served defendant with the January 17 DVRO.

On two other occasions in January or February 2013, defendant had to be taken from Mariani property by the police. On one occasion defendant snuck in to Mariani's Dutton facility through a back door; the police were called. The police were called again when defendant was found in the parking lot at the Dutton facility, standing outside of Irma's car, and Irma was inside the car honking her horn. According to a coworker, Irma appeared to be scared. Afraid of defendant, Irma asked her employer, Mariani, to obtain a restraining order as well.

4

On January 29, 2013, a criminal protective order issued (January 29 CPO); it too protected Irma and the children from defendant through conduct and stay-away orders. The January 29 CPO was set to expire on April 14, 2014. Defendant was served a copy of that order at the hearing on January 29, 2013.

On February 5, 2013, following a hearing, a domestic violence restraining order was issued against defendant (February 5 DVRO).[3] Defendant was present at that hearing, thus no further service was required. The February 5 DVRO protected Irma, as well as her children, and included stay-away and conduct orders. Included in the stay-away orders were orders that defendant stay 100 yards away from Irma's workplace and the children's schools.

Mariani also petitioned for a "workplace violence prevention" temporary restraining order against defendant. On February 8, 2013, the trial court granted Mariani's request (February 8 WVRO). The February 8 WVRO protected Irma and her children and included numerous conduct and stay-away orders. Pursuant to that order, defendant was ordered not to "enter the workplace of the employee [i.e., Irma]." Defendant also was ordered to stay at least 100 yards away from "the employee's . . . jobs or workplaces." On February 21, 2013, and again on March 6, 2013, the February 8 WVRO was reissued and new hearing dates set. Defendant was served with each of these orders on February 22, 2013, and March 7, 2013, respectively.

On February 8, 2013, defendant appeared at his son's middle school and asked the school secretary if he could speak to his son. The secretary knew a restraining order was in place prohibiting defendant from being on campus or being within 100 yards of his son. She called the police. Winters Police Sergeant Jose Ramirez responded to the secretary's call. Defendant told Sergeant Ramirez he was there to see his son and to give

---

[3] The order was signed on February 4, 2013, but was not filed until February 5, 2013.

5

him a watch. Sergeant Ramirez reminded defendant he was subject to a restraining order and was not allowed to be there. Defendant said he thought the restraining order applied only to Irma. Sergeant Ramirez arrested defendant and took him into custody. Irma was notified of the incident by a school administrator; defendant's presence at the school scared Irma.

On March 28, 2013, Irma and Maria Castro, a member of Mariani's human resources department, were in court when defendant was sentenced in a related matter. At that time, the court issued another CPO (March 28 CPO). The March 28 CPO ordered defendant to remain 100 yards away from Irma and their children and to stay away from two specific locations: "803 Grand Ave Space #8 Winters CA 95694" (the parties' trailer) and "1005 Ho[o]ver St. Winters CA 95694" (the home of Irma's parents). The trial court stated on the record that the March 28 CPO included an order that "[defendant] stay away from [Irma's] workplace, so the criminal protective order that the Court just signed would keep him away from [Irma's] workplace as long as she works there. [¶] . . . [¶]

"[] Sounds to me like the criminal protective order protects not only [Irma] but her workplace." The trial court further ordered defendant to have no contact with Irma or their children.

Following that hearing, while defendant was still in court, Castro asked the court to issue a permanent WVRO. Defendant objected to the order but the court ruled: "I am prepared to follow up with the restraining order by issuing a preliminary injunction which would prohibit [defendant] from coming on the property of Mariani Nut Company in Winters." The court then advised Castro: "I'm not issuing a permanent injunction at this time. If you wish to get a permanent injunction, you should schedule this for a hearing in the civil department, and the court will consider that."

That same day, Castro obtained a permanent WVRO for Mariani (March 28 WVRO) from a different judicial officer. She later testified that she pursued the

6

permanent order at Irma's request, and to protect Irma and her children from defendant. Castro's intent in obtaining the order was to keep defendant away from "[a]ll of Mariani property." The March 28 WVRO thus specifically included an order that defendant not "[e]nter [Irma's] workplace" and defendant must stay at least 100 yards away from "[Irma's] workplace."[4] The March 28 WVRO also included an order that defendant stay away from the parties' trailer and Irma's parents' home. Defendant was not present at the hearing when the trial court issued the March 28 WVRO.

Shortly thereafter, defendant appeared at the Abbey office to apply for a job with Mariani. Then, on April 5, 2013, Irma saw defendant at their trailer; she drove immediately to the Winters Police Department. Irma was angry that defendant was at the trailer. Irma gave Corporal Albert Ramos a copy of the CPO and told him that she wanted to clean the trailer but did not feel safe because defendant was there; he confirmed the order with "dispatch."

Corporal Ramos drove to the trailer and knocked on the door; defendant answered. Ramos advised defendant that he could not be on the property and was in violation of the court's order. Defendant admitted he had a copy of the order, but he had not read it. Ramos "re-advised" defendant of the restraining order and further advised him that, because the trailer was posted "uninhabitable," no one was supposed to be living there. Defendant did not respond; Ramos arrested him.

A few days later, on April 8, 2013, defendant returned to the Abbey office and spoke with Cristina Alvarez, a Horizon employee who hires temporary employees for Mariani. Alvarez knew defendant was not supposed to be there so she contacted Castro and stalled defendant by giving him a job application. Castro contacted law enforcement. Officer Justin Wilson responded to the call. He later testified that he remembered the

---

**4** Castro testified that she was at the hearing on the March 28 WVRO and, according to her testimony, the court issued the order to include all of the Mariani properties.

WVRO prohibited defendant from being on any of the Mariani properties in Winters. When Officer Wilson arrived at the Abbey office, defendant was filling out the job application. Officer Wilson arrested defendant.

Irma continued to be afraid that defendant would harm her because "he wasn't obeying the restraining order and he kept on doing this."

### D. Criminal Charges, Jury Trial, and Sentencing

The People subsequently charged defendant with felony stalking (§ 646.9, subd. (a); count 1), felony stalking and violating a court order (§ 646.9, subd. (b); count 2), misdemeanor contempt of court by contacting persons protected by a court order (§ 166, subd. (c)(1); counts 3 & 4), and misdemeanor violation of a protective order (§ 273.6, subd. (a); count 5). Defendant plead not guilty.

A jury found defendant guilty of counts 2 through 5, and the court declared an acquittal on count 1. The trial court later sentenced defendant to an aggregate term of four years four months in state prison. Defendant appeals.

### DISCUSSION

Defendant contends there is not substantial evidence supporting his convictions for stalking and violating court orders. We are not persuaded.

"In reviewing a claim of insufficient evidence, we review the record in its entirety, considering the evidence most favorably to the prevailing party, and determine whether any rational trier of fact could have found the prosecution proved its case beyond a reasonable doubt. [Citation.]" (*People v. Zavala* (2005) 130 Cal.App.4th 758, 766.) In making this assessment, we draw all reasonable inferences from the record in support of the judgment and do not weigh the evidence or decide the credibility of the witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

### A. Stalking

Defendant argues there is not sufficient evidence of stalking because that offense requires a course of conduct established by two or more acts and here, he contends, there

are no qualifying acts between April 5, 2013, and April 8, 2013.[5] He reaches this conclusion by claiming that while "his actions from November 2012 through the end of January, 2013, would be sufficient to constitute harassment under the stalking statute," the People did not charge him for those acts and those acts cannot be relied upon to convict him for his nonharassing conduct between April 5, 2013, and April 8, 2013. Defendant's argument is unavailing.

The elements of stalking are: "(1) following or harassing another person; (2) making a credible threat; and (3) intending to place the victim in reasonable fear for her safety." (*People v. Uecker* (2009) 172 Cal.App.4th 583, 594; § 646.9.) Harassing another person is directing a "course of conduct . . . at a specific person that seriously alarms, annoys, torments, or terrorizes the person." (§ 646.9, subd. (e).) Defendant's argument relies on ignoring his pattern of conduct and isolating the final incidents in April 2013 that gave rise to the charges here.

It is, however, the entirety of the course of conduct that must be harassing, not each individual act within the course of conduct. That is, taken separately the acts need not be terrorizing or alarming, if when taken as a course of conduct, they rise to that level on a cumulative basis. (§ 646.9, subds. (e) & (f); *People v. Culuko* (2000) 78 Cal.App.4th 307, 325.) Furthermore, it is not necessary that each individual act making up the course of conduct contain within it a credible threat. Rather, at some point in the course of conduct, a singular credible threat must be made. That threat may even be implicit in the pattern of conduct. In assessing the course of conduct and whether a

---

[5] Defendant focuses a great deal of his commentary here on the People's closing argument at trial. He argues the prosecutor did not understand the stalking law and gave the jury wrong information. Defendant does not, however, raise any claim of prosecutorial misconduct or error in the closing argument. Nor does defendant argue the jury was not properly instructed on the crime of stalking. Defendant argues only that there was insufficient evidence. Consequently, that is what we address.

threat occurred, we must consider the "entire factual context, including the surrounding events." (*People v. Falck* (1997) 52 Cal.App.4th 287, 298; accord, *People v. Uecker, supra*, 172 Cal.App.4th at p. 598, fn. 10.)

Viewing the evidence in the light most favorable to the verdict and in its entirety, we find there is substantial evidence supporting defendant's conviction for stalking Irma.

Beginning in October 2012, defendant engaged in a campaign of harassment against Irma. Indeed, defendant acknowledges as much in his opening brief. Defendant threatened Irma and her parents by suggesting the brakes could fail in their cars. Defendant threatened Irma and their son when he poured wine over her car then held up a lighter. Between October 2012 and January 2013, defendant repeatedly showed up at Irma's parents' house and her workplace, despite her repeated demands that defendant leave her alone. Defendant repeatedly called Irma and if she failed to answer her phone, defendant went looking for her.

Irma would get rides home from work because she was afraid to run into defendant in the parking lot. She even sought permission to park inside Mariani's facilities so defendant could not confront her in the parking lot as she walked to her car. Defendant even physically assaulted Irma in the parking lot of her workplace, grabbing her cell phone when she said she would call the police.

Defendant also repeatedly violated the court's restraining orders. Shortly after defendant was served with an order prohibiting him from contacting Irma and their children, defendant went to their son's school in violation of the order. Police were called twice to remove defendant from Irma's workplace in January or February 2013, after an order was issued prohibiting defendant from going to Irma's workplace. And he continued to go to the Abbey office to find work despite an order requiring him to stay away from Irma's workplace.

When considered in the context of that behavior, it was reasonable for the jury to conclude that defendant's appearances at the parties' trailer on April 5, 2013, and then at

10

Irma's workplace on April 8, 2013, both in violation of court orders, were part of a pattern of conduct by defendant which Irma found seriously alarming or annoying. (See *People v. Zavala, supra*, 130 Cal.App.4th at p. 767.)

Defendant argues there was no evidence that his conduct on April 5 and April 8 caused Irma to be afraid. We disagree. Irma testified she was afraid of defendant. Moreover, it is evident from the record that defendant's pattern of conduct caused Irma to be afraid of him. Not only did Irma seek multiple restraining orders in an effort to protect herself from defendant, she even asked Mariani to get its own restraining order to keep defendant from coming to her workplace.

Defendant also argues his appearances at the parties' trailer and at the Abbey office do not constitute stalking behavior because he was there with a legitimate purpose: to find shelter and employment. Defendant has a right to find shelter and employment, but not at places various courts judicial officers repeatedly and successively ordered him to avoid.

Considering the entire context of the case, the history between the parties, defendant's course of conduct of threatening Irma and repeatedly showing up at Irma's home, the parties' trailer, Irma's workplace, and the children's school, often in spite of a restraining order, it was reasonable for the jury to conclude defendant's conduct constituted harassment as defined in the stalking statute. Accordingly, there was substantial evidence to support the stalking conviction.

### B. Violating Court Orders

Defendant further contends there is insufficient evidence he violated the court's orders, as alleged in counts 4 and 5. In count 4, defendant was charged with contempt of court for violating a criminal protective order "[o]n or about April 8, 2013." (§ 166, subd. (c)(1).) In count 5, defendant was charged with knowingly violating a protective order "[o]n or about April 8, 2013." (§ 273.6, subd. (a).) Defendant argues the evidence presented at trial was insufficient to prove he "intentionally, knowingly or willfully

11

violated the court orders" by going to the Abbey office on April 8, 2013. We are not persuaded.

1. *There was sufficient evidence the March 28 CPO included an order that defendant stay away from Irma's workplace.*

Defendant argues there was insufficient evidence to convict him of violating a criminal protective order on April 8, 2013, as alleged in count 4, because the operative criminal protective order was the March 28 CPO and the March 28 CPO did not include an order that defendant stay away from Irma's workplace. Rather, the March 28 CPO required only that defendant remain 100 yards away from Irma and the parties' children. Because neither Irma nor their children were at the Abbey office on April 8, 2013, defendant argues he could not have violated the March 28 CPO. The record does not support defendant's claim.

A page is missing in the appellate record from the March 28 CPO and the first page does not include an order prohibiting defendant from going to Irma's workplace. At the March 28 hearing, however, the trial court made it clear from the bench that the March 28 CPO included an order that required "[defendant] stay away from [Irma's] workplace, so the criminal protective order that the Court just signed would keep him away from [Irma's] workplace as long as she works there. [¶] . . . [¶]

"[] Sounds to me like the criminal protective order protects not only [Irma] but her workplace."

Thus, reviewing the record as a whole, we conclude there was sufficient evidence for the jury to find the March 28 CPO included an order that defendant stay away from Irma's workplace.

12

2. *There is sufficient evidence to support the jury's finding that the Abbey office was a part of Irma's workplace, protected by the March 28 orders, and defendant knew it was part of Irma's workplace.*

Defendant also argues there was insufficient evidence to convict him of violating either the March 28 CPO or the March 28 WVRO because the Abbey office was not protected as part of Irma's workplace. Reviewing the evidence in a light most favorable to the judgment, as we are required to do, we conclude there was sufficient evidence from which the jury could find the Abbey office was a part of Irma's workplace, protected by both March 28 orders, and that defendant knew it was a part of Irma's workplace.

According to trial testimony, Irma's workplace included multiple locations including the Dutton facility, the Baker facility, and the Abbey office. The Abbey office was where mandatory safety meetings were held for all Mariani employees and where Irma would go if there was a problem with a temporary employee. The Abbey office also housed the Horizon employment agency, whose sole function at that site was to hire temporary employees for Mariani. Outside the front door of the Abbey office was a sign which read "Horizon Personnel Services." There was also a banner with the Mariani logo on it, a "board" that read "Mariani Nut Company," and another board indicating Horizon hires for Mariani. Viewed in a light most favorable to the judgment, we conclude this is sufficient evidence from which the jury could find the Abbey office was part of Irma's workplace.[6]

There also was sufficient evidence from which the jury could find defendant knew the Abbey office was part of Irma's workplace. During their 15-year marriage, Irma

---

[6] The parties talk of the "Mariani properties." This prompts unnecessary confusion. The order says defendant is to stay away from Irma's "workplace," thus, because the jury implicitly concluded defendant knew the "Mariani properties," including the Abbey office, comprised Irma's "workplace," he was precluded from being there and knew it.

13

worked exclusively for Mariani and for several years, defendant did seasonal work for Mariani. Indeed, defendant continued going to the Abbey office trying to get seasonal work with Mariani after he and Irma separated. It was, therefore, reasonable for the jury to presume defendant knew the Abbey office was where Mariani safety meetings were held and the office where Mariani's temporary employees were hired and managed, and thus, was part of Irma's workplace.

Defendant further argues the order is unconstitutionally vague if it was intended to protect any "unspecified properties." Defendant's argument fails because a conviction for violating the order requires that he "knowingly and intentionally" violate the order. If defendant did not know the Abbey office was a part of Irma's workplace, he could not have been convicted of violating either order.

In sum, we find the evidence was sufficient to convict defendant of violating both the March 28 CPO and the March 28 WVRO, as alleged in the information. Additionally, we note our concern regarding the facts of this case. Over more than six months, multiple judicial officers issued numerous protective orders in an effort to protect Irma and her family. Defendant repeatedly violated those orders. This is a story we hear all too often. Irma and her family were lucky no greater harm came to them, not all victims are so lucky. It is of great concern that those who violate protective orders are not routinely prosecuted after the first violation. Waiting for multiple violations before charging a defendant with criminal conduct puts the victims, including children, at greater risk. Whether this problem is one that must be addressed at the legislative level or in prosecutors' offices, it is an issue that must be addressed.

14

DISPOSITION

The judgment is affirmed.


      NICHOLSON    , Acting P. J.


We concur:


      MAURO     , J.


      HOCH     , J.