Filed 12/16/25  P. v. Murray CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>PARRIS RAMON MURRAY,<br><br>      Defendant and Appellant. | B336638<br><br>(Los Angeles County<br> Super. Ct. No. BA518083) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Renee Korn, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield, Supervising Deputy Attorney General, Charles Chung, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Parris Ramon Murray appeals his conviction for stalking.  (Pen. Code, § 646.9.)[1]  He argues (1) the evidence is insufficient to support his conviction, (2) the trial court erred in failing to instruct sua sponte on the lesser included offense of attempted stalking, and (3) the court erred by failing to instruct the jury it had to unanimously agree which acts constituted harassment for purposes of stalking.  We disagree with each contention and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Evidence at Trial

For more than three years, Gabrielle P. lived in her van in an alley behind an auto repair shop run by her friend Juan Carlos Mercado.  Mercado allowed Gabrielle to live in the alley because she felt safe there.  Gabrielle shared the van with her cat, Georgie, whom she had raised and owned for about five years.

Gabrielle first met Murray in February 2023 when he began painting a mural of two giant black wings on a wall in the alley.  He asked her if she would go to a store and buy him something to drink and "some blunt wrappers," which she did.  Gabrielle testified that Murray was initially quiet and polite.  However, after she brought him a soda in the first week or so of meeting, Murray grabbed her from behind with a sudden bear hug and clutched her breast.  Gabrielle was shocked and said she felt the "fear response," which caused her to "stop still and endure until it was over."

---

[1]     All further statutory references are to the Penal Code.

Murray went to the alley every day, and Gabrielle felt dread when he was there. He started intimidating and chasing away people who tried to walk through the alley, especially Gabrielle's friends. He would ask how they knew Gabrielle and tell them they could not walk through the alley. After a few weeks, Murray finished the mural but continued going to the alley.

Murray began threatening Gabrielle. He went to the alley on an evening in early April 2023. Two friends were visiting Gabrielle, and she asked them to stay with her for protection when Murray arrived. Hours later, Murray, unprovoked, threatened to steal Gabrielle's van and to "beat [her] ass." Gabrielle believed Murray's threats. At about three in the morning, Gabrielle fled to the home of her friend Marisha Madrigal and rang the doorbell. The alley was behind Madrigal's house.

Madrigal woke up when the doorbell rang. She saw Gabrielle standing on the front porch looking panicked. Gabrielle said there was someone stalking her and she was afraid. Madrigal invited her inside and tried to calm her down. Gabrielle was trembling and terrified. Madrigal had never seen her in that state.

Gabrielle asked Madrigal to call 911. Gabrielle reported in the 911 call that Murray threatened to steal her van and beat her to death. The police showed up, but she felt they did not take her seriously. They suggested she move her van, and she did so for the night.

Later that same day, Murray went back to the alley and threatened to kill Gabrielle and shoot her cat in the face. Gabrielle ran to Mercado's shop. Mercado saw her shaking,

crying, and trying to hide.  Mercado went to the alley and saw Murray leaving.  Mercado called 911 and reported Murray threatened Gabrielle.

The following morning, Murray sped into the alley and parked directly in front of Gabrielle's van.  Gabrielle was sitting in her van with her phone beside her.  Murray went up to her and took her phone.  He said, "You called the cops, b*tch."  Gabrielle denied doing so, and Murray told her, "[Y]ou better hope that you're not lying . . . ."  He drove away with her phone.  He returned 10 minutes later, threw Gabrielle's phone back into her van, and said, "'You're lucky you're not lying.'"

On another occasion, Murray went to Gabrielle's van and tried to enter uninvited.  Gabrielle stopped him from doing so by putting her finger to his chest and saying, "No man enters my car."  Murray said, "If you want to keep this car, you better let me in."  Gabrielle again declined.  Murray backed off and told Gabrielle he hoped she was ready to deal with the consequences.  She felt certain he was going to follow through on his threat.

Gabrielle testified that, over the months, Murray returned to the alley close to a hundred times.  He would spend anywhere from one to 10 hours there.  He would park his car directly behind Gabrielle's van and keep the engine running, which made loud whirring noises, at all hours of the day.  Gabrielle could hear the loud whirring when he was there and could not sleep because of the noise.

Gabrielle was generally too afraid to ask Murray to move his car.  When Gabrielle did ask him to move his car a few times, he did not do so.  In one instance, he moved his car when she asked but returned shortly after.  To try to stop him from parking directly by her, Gabrielle placed broken glass by her van that she

kept with a broom.  While the broken glass stopped Murray from parking directly by her van, he continued to return and park in areas that blocked the alley.  Gabrielle stated she felt a "relentless sense of legitimate dread" whenever Murray was in the alley.

The day before Labor Day in September 2023, Murray parked his car in the alley with the engine running.  Gabrielle's cat got away from her and ran into some bushes behind Murray's car.  Gabrielle was afraid her cat was going to run away because Murray's engine scared it.  Gabrielle asked Murray if he could move his car so her cat could get out of the bushes, but Murray laughed and rolled up his windows.  Gabrielle was unable to get her cat, and it went deeper into the neighborhood.  She was exhausted from not sleeping the last few nights because Murray had parked by her van with the engine running.  Frustrated looking for her cat, she yelled, "'Why are you being such a n*gger.'"  She then went to search for her cat.

The next day, Gabrielle was sleeping in her van in the early afternoon.  She left the door slightly open so her cat could get in if it returned.  Murray suddenly yanked open the door to the van and climbed on top of her.  Murray put one hand over Gabrielle's mouth and inserted his other hand into her vagina.  Murray said, "'Why aren't you wet yet, b*tch,'" and "'Do you have any idea what my people have been through for that word, b*tch.'"  Murray took his hand out of her vagina and tried to unzip his pants.  Gabrielle broke free and grabbed a knife she kept in her van.  She backed up holding the knife, saying, "'Get off.  Get off.'"  She urinated on herself when this happened.

Gabrielle ran to a nearby gas station.  She was in a panic screaming, and the gas station cashier saw Gabrielle's clothes

were ripped and that she was really scared. The cashier also noticed Gabrielle had red marks on her neck. The cashier called 911. Gabrielle spoke with the police and told them what happened. Additionally, Gabrielle called Madrigal after the incident. Madrigal described Gabrielle as sounding "extremely upset. . . . Kind of screaming, crying, every indication of being upset."

Murray drove up as Gabrielle was speaking to a friend outside the same gas station the following morning. He told Gabrielle he was going to have his sister beat her up and that her "days were numbered." He approached Gabrielle, and she raised her hand to show him a taser she was holding. Murray said, "[O]h, really. I got something better than that," walked back to his car, and started reaching as if he was going to pull something out. He then smiled, got back into his car, and left.

Murray continued driving to and sitting in the alley after the sexual assault. On one occasion after seeing him drive through, Gabrielle packed up her belongings and drove elsewhere for the night because she was afraid something bad was going to happen. She returned the next morning. That day, Murray again pulled up next to Gabrielle's van. He rolled his window down and told her that he was going to burn her van with her and her cat in it. Gabrielle felt that he meant it.

Los Angeles Police Department Detective Myra Correa, who conducted special assault investigations, was assigned to the case. Gabrielle texted Detective Correa about Murray's threat to burn her van the same morning he made the threat. Gabrielle had also texted Detective Correa a few days prior, telling her Murray was in the alley behind her. Detective Correa obtained surveillance video of Murray's car in the alley from a security

camera on Mercado's property. She obtained surveillance video of the alley and Gabrielle's van at the time of the sexual assault from a security camera on Madrigal's property. Additionally, Detective Correa obtained six 911 calls relating to Gabrielle.

## B. Verdict and Sentencing

Murray was charged by information with stalking (§ 646.9, subd. (a); count 1) and sexual penetration by use of force (§ 289, subd. (a)(1)(A); count 2).

In March 2024, the jury found Murray guilty on count 1, not guilty on count 2, and guilty of the lesser included offenses of assault with intent to commit forcible sexual penetration (§ 220) and sexual battery (§ 243.4). In a bifurcated proceeding, the trial court found an aggravating factor under California Rules of Court, rule 4.421(b)(2) to be true. The court sentenced Murray to a total term of four years and eight months.

Murray timely appealed.

## DISCUSSION

## A. Substantial Evidence Supports the Stalking Conviction

Murray argues there was insufficient evidence to support his stalking conviction. We disagree.

The elements of stalking are: (1) willfully, maliciously, and repeatedly following or willfully and maliciously harassing another person; (2) making a credible threat; and (3) intending to place the person in reasonable fear for his or her safety. (§ 646.9, subd. (a).)

Under section 646.9, "'harasses' means engages in a knowing and willful course of conduct directed at a specific

7

person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) "'[C]ourse of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (§ 646.9, subd. (f).) "'[C]redible threat' means a verbal or written threat, . . . or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for their safety, or the safety of their family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for their safety or the safety of their family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).)

We review challenges to the sufficiency of the evidence for substantial evidence. (*People v. Tafoya* (2025) 109 Cal.App.5th 868, 892; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658.) "[W]e review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." (*Tafoya*, at p. 892.) "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293

(*D'Arcy*).)  We do not reweigh evidence or reevaluate a witness's credibility.  (*Ibid.*)

The record discloses ample evidence to support Murray's stalking conviction.  Gabrielle testified that Murray came to the alley where she lived nearly 100 times over the course of several months, and the record shows many acts of willful and malicious harassment during this time.  Early on, Murray grabbed Gabrielle from behind and clutched her breast.  Murray chased Gabrielle's friends out of the alley to keep them away from her.  He would park directly by or near her van and keep his engine running, which made loud noises that kept Gabrielle awake at night.  Murray sexually assaulted her on Labor Day 2023 and continued to seek her out in the following days and weeks.  Murray argues that there is no evidence he entered the alley with the "intent or design" to harass or intimidate Gabrielle.  Even if we accepted this as true, Murray nonetheless repeatedly harassed Gabrielle once he was in the alley.  Accordingly, there is substantial evidence that Murray harassed Gabrielle.

Substantial evidence also supports the jury's finding that Murray made a credible threat to Gabrielle.  In early April 2023, Murray threatened to steal Gabrielle's van and to "beat [her] ass."  He also threatened to beat Gabrielle and shoot her cat. When Gabrielle denied reporting his threats to the police, he told her, "[Y]ou better hope that you're not lying . . . ."  When Murray tried to enter Gabrielle's van uninvited and she refused him, he told her that she had better be ready to deal with the consequences.  Murray later sexually assaulted Gabrielle, and the next morning, he said his sister was going to beat her up.  He also told Gabrielle her "days were numbered."  Shortly after, Murray returned to the alley and threatened to burn Gabrielle's

van with her in it. A reasonable jury could conclude that Murray's acts and statements constituted a credible threat under section 646.9. (See *People v. Uecker* (2009) 172 Cal.App.4th 583, 594–596 (*Uecker*) [defendant's conduct of following victim over seven months, placing hostile notes on her car, and positioning himself so he could see her come and go at work, constituted credible threat].)

Furthermore, substantial evidence supports the jury's finding that Murray intended to place Gabrielle in reasonable fear for her safety. "'"[I]ntent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence."'"" (*People v. Frias* (2024) 98 Cal.App.5th 999, 1019 (*Frias*).) The many threats Murray made, along with the encroachment on her living space and the sexual assault, indicate that he intended to put her in reasonable fear. The evidence showing that Murray persistently parked near her with his engine running also supported an inference that he wanted her to know he was watching her to put her in fear. (See *Uecker*, *supra*, 172 Cal.App.4th at p. 595 ["a reasonable jury could conclude defendant wanted [the victim] to know he had been watching her while she was parked at work and keeping track of her schedule to place her in fear of her safety"].)

Additionally, Gabrielle consistently testified that she believed Murray's threats and feared for her safety. Other witnesses corroborated her statements and described seeing her terrified of Murray. On one occasion, Mercardo saw her panicked and shaking when she was trying to hide in his shop after Murray threatened her. On another occasion, Madrigal saw Gabrielle trembling after Murray threatened her. The cashier at the gas station saw Gabrielle screaming and scared after Murray

assaulted her.  Gabrielle and her friends called the police multiple times because of the threats.  "A reasonable jury could infer from [Murray's] course of conduct 'that he intended the result he caused.'" (*Frias*, *supra*, 98 Cal.App.5th at p. 1019.)

Murray admits he was "in the alley almost on a daily basis" but asserts it was to work on his mural, not to harass Gabrielle.  In essence, he argues the evidence might have supported a contrary finding, but this is immaterial under the applicable standard of review.  (*D'Arcy*, *supra*, 48 Cal.4th at p. 293.)  On the record before us, a reasonable jury could find beyond a reasonable doubt that Murray's conduct posed a credible threat to Gabrielle and that he intended to put her in fear for her safety.  Substantial evidence thus supports Murray's stalking conviction.

## B. The Trial Court Did Not Err by Not Giving Lesser Included Offense Instructions for Attempted Stalking

Murray contends the trial court prejudicially erred in failing to instruct the jury on the lesser included offense of attempted stalking.  He acknowledges he did not request the instruction but contends the court was required to give the instruction sua sponte because there was substantial evidence that he took several direct but ineffectual steps towards stalking Gabrielle.  We are not persuaded.

"Trial courts must instruct on general legal principles closely related to the case, including necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present.  But the existence of any evidence, no matter how weak, will not justify instructions on a lesser included offense, for such instructions are required only

11

where there is substantial evidence from which a rational jury could conclude that the defendant committed the lesser offense *but not the greater offense.*" (*People v. Obermueller* (2024) 104 Cal.App.5th 207, 217 (*Obermueller*).) "'Substantial evidence,' in this context, 'is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'" (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.) We review the trial court's failure to instruct on a lesser included offense de novo. (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)

"In a noncapital case, the error in failing to instruct on a lesser included offense is reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 . . . which requires reversal of the conviction for the greater offense 'if, "after an examination of the entire cause, including the evidence" [citation], it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred.'" (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1335.)

Murray must identify evidence that would have permitted conviction on the lesser offense but would not have allowed conviction on the greater charge. (*Obermueller*, *supra*, 104 Cal.App.5th at p. 216.) He asserts that the occasion where Gabrielle called him a racial epithet undermined any claim his conduct placed her in actual and reasonable fear. However, the statutory offense of stalking requires a course of conduct. (*People v. Zavala* (2005) 130 Cal.App.4th 758, 769 (*Zavala*).) Murray cites no authority suggesting that each of a perpetrator's acts throughout a course of conduct must individually satisfy the elements of stalking. To the contrary, the jury was required to consider his entire course of conduct. The trial court had no duty to instruct on attempted stalking, for there was no substantial

12

evidence from which a rational jury could conclude that Murray committed the lesser offense but not the greater one. (*Obermueller*, *supra*, 104 Cal.App.5th at p. 216.)

Furthermore, any error in failing to give an instruction on attempted stalking is harmless. As we have discussed, the evidence that Murray's conduct placed Gabrielle in reasonable fear for her safety was overwhelming. Murray, over a period of months, continually bothered, threatened, and harassed Gabrielle. Gabrielle testified that she was scared and believed he would carry out the threats. Madrigal, Mercado, and the gas station cashier corroborated her fear. Based on the evidence presented at trial, it is not reasonably probable that the jury would have found Murray only attempted and did not complete the crime of stalking.

## C. The Trial Court Was Not Required to Instruct on Unanimity

The trial court declined to give the jury an instruction on unanimity (CALCRIM No. 3501) because stalking requires a continuous course of conduct. Murray argues the court erred. He argues the jury should have been instructed on the need to unanimously agree on what acts constituted harassment under the stalking statute. We reject his contention.

"The requirement of unanimity as to the criminal act is intended to eliminate the danger the defendant will be convicted even though there is no single offense all the jurors agree the defendant committed." (*Zavala*, *supra*, 130 Cal.App.4th at p. 768.) However, "[t]here is a well established exception to the unanimity instruction requirement in cases in which the defendant is charged with violating a statute by a continuous

13

course of conduct." (*Ibid.*)  "[T]here is no need for a unanimity instruction as to individual acts within the course of conduct, because the jury need only agree on whether the defendant committed acts the net effect of which constitutes the statutory offense." (*Id.* at p. 769.)  Stalking is "self-defined to require a course of conduct." (*Ibid.*)

The evidence shows that Murray's stalking consisted of one continuous course of conduct.  The prosecutor did not make any meaningful distinction between Murray's conduct for purposes of the stalking conviction.  "Because [Murray] was charged with a 'course of conduct' offense occurring over a period of time, we conclude that the continuing course of conduct doctrine applies and, therefore, no unanimity instruction was required." (*Zavala*, *supra*, 130 Cal.App.4th at p. 769.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MORI, J.

We concur:


COLLINS, acting P. J.


TAMZARIAN, J.

14