Filed 1/28/22  P. v. Molina CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076167 |
| v. | (Super.Ct.No. FVI19003109) |
| MARIO ADAM MOLINA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Rodney A. Cortez, Judge.  Affirmed as modified.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Mario Adam Molina guilty of stalking in violation of a restraining order (Pen. Code,[1] § 646.9, subd. (b), count 1) and found true the allegation that he was subject to a temporary restraining order. The jury also found him guilty of violating a protective order. (§ 273.6, subd. (a), count 2.) A trial court sentenced defendant to the upper term of four years on count 1, plus a concurrent term of one year on count 2.

On appeal, defendant contends: (1) the evidence was insufficient to show he stalked the victim while a restraining order was in effect; (2) the concurrent term on count 2 must be stayed pursuant to section 654; and (3) the matter should be remanded for resentencing because the court mistakenly believed it did not have the discretion to grant probation, and it relied on improper and unsupported factors to impose the upper term on count 1. The People concede, and we agree, that the sentence on count 2 should be stayed under section 654. Otherwise, we affirm the judgment.

## FACTUAL BACKGROUND

R.D. (the victim) and defendant dated from 2009 to 2015 and had two children together. During their relationship, defendant threatened the victim frequently, telling her that if she ever left him, she would cry "tears of blood." She understood that to mean that she would never see her kids again and that he could kill her. Defendant also told her he would put her six feet under. In 2011, he poured cold water on the victim when she was

---

[1] All further statutory references will be to the Penal Code unless otherwise noted.

taking a shower. In response, she did the same thing to him. He came out of the shower, pushed her against the wall, and slapped her on the face twice. In August 2013, shortly after the victim gave birth to their youngest daughter, the victim found defendant sleeping with the television on. She complained that he needed to get a job to help pay the bills. Defendant said, "You're going to start nagging, you b----." The victim became upset, told him she was tired of everything, and said she wanted to break up. He got upset, followed her to the kitchen, and slapped her. She slapped him back and tried to get away from him, but defendant followed her and punched her on the left side of her forehead. The victim lost consciousness for 30 seconds. When she recovered, she scratched him, and he punched her in the nose. Defendant also dragged her by the hair. The victim called the police.

The victim got a restraining order against defendant in July 2015, and defendant was not allowed to be in the home as a result. The restraining order was for one year. In 2015, the victim told defendant she wanted him out of her life and did not want to have anything to do with him. They broke up in 2015. Between 2015 and 2019, defendant continued to threaten her—approximately 100 times.

In 2019, defendant was still contacting the victim. She had full custody of their children, and he had no visitation rights. In August 2019, defendant went to the victim's house, and she told him to leave or she would call the police. In October 2019, defendant left the victim over 30 voicemails with threatening messages. In some of the messages, he told her that if she was dating someone, that person would be dead, and she would be dead too. In one message, defendant said the victim's stepdad was "going to pay," and that she was "going to be gone with him." In another one, defendant told her that if she did not do

3

what he said, the kids would be at a foster home. She took that as a threat that he was going to kill her. He also continued to state that the victim would cry "tears of blood." In one of the messages, defendant said he was going to bust her mouth. The victim felt scared, anxious, and was in fear for her life. That month, defendant also drove by her house about five or six times a day, except for one or two days when he did not show up. The victim was so scared that she checked the camera and recordings on her Ring doorbell all the time. Seeing defendant drive by her home made her feel nervous and anxious because she would remember all his threats, and she knew he had a gun. Every time she saw him, she would panic, feel angry at herself for being with someone like him, and cry.

On the morning of October 30, 2019, the victim walked outside her house and saw defendant sitting in his car, parked on the street in front of her neighbor's house. He was staring at her and held up a gun. She felt scared and took his conduct as a threat since he had previously told her he was going to put her six feet under, and that she was going to be gone. Defendant left the victim a voice message at around 8:00 p.m. that night, saying she needed to contact her ex-boyfriend, who was an FBI agent, because defendant wanted his help. Defendant threatened her by saying that if she did not help him, he would knock the door down, take her kids, and slap her. The victim saw defendant outside her house after she received the voice message and called the police.

On November 1, 2019, the victim obtained a temporary restraining order against defendant. It required him to stay away from her, her car, her home, and her children. The order was in effect until November 25, 2019. Defendant was served with a copy of the restraining order.

4

During the time period from November 1, 2019, to November 15, 2019, defendant left the victim about 15 voicemail messages containing similar threats to the ones in the past. However, the messages were more aggressive, and the tone of his voice sounded angry. Defendant told the victim that he did not care who she called or what she did, and that he would still kidnap her kids. Receiving the messages made the victim feel scared, nervous, and filled with anxiety. One of the voicemails mentioned her stepdad, and she was scared that defendant was going to harm him. Defendant told the victim that she was "going to be gone" and so was her stepdad, and that she would "end up losing because this is not a game." In another voicemail, defendant said the victim was going to be gone for not listening and helping him with the problem he had, and that the kids would end up in a foster home.

During the same period from November 1, 2019, to November 15, 2019, defendant drove by the victim's house about 40 times. The victim had a Ring doorbell camera that showed when he drove by. Her Ring doorbell camera recorded defendant on November 1, 2019, driving by and then stopping next to the victim's car at approximately 7:30 p.m. Defendant pushed her mirror in toward her car. The victim went outside to examine her car and noticed that it had some damage to the back on the driver's side. That damage was not there before.

On November 15, 2019, the victim received three voice messages from defendant. She deleted one of them and listened to the other two. The two contained similar threats as before, except defendant also said that he was coming. Defendant said he had texted and called her, and that he was going to do something to get her attention. In the second voice

5

message, defendant said the victim was acting stupid and that she "was going to see the consequences of [her] not paying attention to him." Defendant was singing on the voicemail like he was "out of his mind," and his tone of voice was scary. The victim took the voicemails as a threat that he was going to kill her, and she was in fear for her life and the safety of her children. She knew he was serious because she had seen him following her earlier that day when she was coming home with her kids.

The victim called the police, and an officer responded. The officer noted that she was "very concerned and panicked," and by the end of their contact, she was crying. The victim told the officer what had occurred that day and told him where she believed defendant was. The officer located defendant's car at a nearby restaurant and observed defendant sitting in the driver's seat. The officer contacted him, and he told the officer about what had occurred between him and the victim. Defendant admitted knowing about the restraining order. The officer arrested him and took him to a detention center.

At the detention center, the officer read defendant his *Miranda*[2] rights. Defendant waived them and spoke to the officer. The officer recorded the interview, and the recording was played for the jury at trial. Defendant admitted to knowing about the restraining order and to calling the victim. When calling her, he said, "Look, you stupid son of a b----, you need to f---ing wake up. Stop being a dumb mother------." He told her he was going to "disturb" her relationship with her new boyfriend. Defendant admitted that he drove by the

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

victim's house every day, went to her house on November 15, 2019, and pushed in the mirror on her car to get her attention since she was ignoring him.

DISCUSSION

I. <u>The Evidence Was Sufficient to Support Defendant's Conviction in Count 1</u>

Defendant argues the true finding on count 1, that a restraining order was in effect at the time of the stalking, must be reversed since there is no evidence that he made a credible threat to the victim's safety between November 1, 2019, and November 15, 2019. We conclude the evidence was sufficient to support the true finding and the stalking conviction in count 1.

A. *Standard of Review*

In reviewing a challenge to the sufficiency of the evidence, we "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B. *The Evidence Was Sufficient*

Section 646.9, subdivision (a), provides: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, . . ." Section

7

646.9, subdivision (b), provides: "Any person who violates subdivision (a) when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party, shall be punished by imprisonment in the state prison for two, three, or four years."

The jury was instructed that to find defendant guilty of count 1, it had to find that he: (1) "willfully and maliciously harassed or willfully, maliciously, and repeatedly followed another person"; and (2) "made a credible threat with the intent to place the other person in reasonable fear for her safety or for the safety of her immediate family." (See *People v. Ewing* (1999) 76 Cal.App.4th 199, 210.) The jury was further instructed that if it found defendant guilty of stalking in count 1, it had to decide whether the People proved that a temporary restraining order was in effect at the time of the conduct and that the defendant knew of the court order. The jury instructions defined a credible threat as "one that causes the target of the threat to reasonably fear for his or her safety or for the safety of his or her immediate family and one that the maker of the threat appears to be able to carry out."

Defendant contends there was no evidence that he threatened the victim while a restraining order was in effect, specifically claiming there was no evidence he made a "verbal or written threat" between November 1 and 15, 2019. We disagree. Section 646.9, subdivision (g), provides that " 'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, . . ."

8

The evidence here showed the victim obtained a temporary restraining order on November 1, 2019, which required defendant to stay away from her, her car, her home, and her children, until November 25, 2019. Defendant was served with a copy of the restraining order. He admitted to the police officer that he knew about the restraining order. The evidence further showed that while the restraining order was in effect, defendant left the victim 15 voicemail messages and drove by her house about 40 times. The voicemail messages contained threats that the victim was "going to be gone" because she did not listen to defendant or help him with his problem; that she would "end up losing because this [was] not a game"; that he was going to kidnap her kids; that they would end up in a foster home; and that he would harm her stepdad. Defendant also cursed at her, called her names, and threatened to "disturb" her relationship with her new boyfriend. The content of these messages was consistent with the threats defendant had made for 10 years, except that they were more aggressive.

The evidence specifically showed that on November 15, 2019, defendant left three voice messages containing similar threats. He said he had texted and called the victim, and he was going to do something to get her attention. He said she "was going to see the consequences of [her] not paying attention to him." Moreover, earlier that day, the victim noticed defendant following her when she was coming home with her kids. The victim was so scared that she called the police, and the officer observed that she was panicking and crying. Defendant later admitted that he pushed in the mirror on the victim's car to get her attention. Defendant's course of conduct, including his words as well as his actions, constituted a credible threat within the meaning of section 646.9, subdivision (g). (See

9

*People v. Lopez* (2015) 240 Cal.App.4th 436, 453 (*Lopez*) [defendant was obsessed with the victim for years and sent her packages, messages on Facebook, letters and pictures, despite her telling him she wanted nothing to do with him]; see also *People v. Zavala* (2005) 130 Cal.App.4th 758, 767 [despite restraining order, defendant repeatedly contacted wife in person, by telephone, followed her three times, and made express or implied threats].)

Defendant argues that the evidence "wholly fails to show [he] threatened [the victim's] safety," and that his statements could not reasonably be construed as threats made with the intent to place her in fear for her safety. He further contends that her interpretation of his comments as meaning he would kill her "borders on the absurd" and was "unreasonable in the extreme." We disagree. Defendant's voicemails and conduct of following the victim and her children, in the context of many years of him leaving her frightening voicemails, driving by her home, and sitting in his car staring at her while holding a gun, "reveal an obsession that a reasonable person would understand as threatening." (*Lopez*, *supra*, 240 Cal.App.4th at p. 453.)

Defendant further claims that one of the elements of stalking is "actual suffering by the victim of substantial emotional distress" and then argues that there was insufficient evidence of "serious and *reasonable* emotional distress." However, section 646.9 lists no requirement of showing "actual suffering of substantial emotional distress." (§ 646.9.) In any event, contrary to defendant's claim, the evidence showed the victim suffered serious substantial emotional distress, and that her anxiety and fear for her life were reasonable under the circumstances. (See *ante*.)

10

Viewing the evidence in a light favorable to the judgment, as we must, we conclude there was sufficient evidence to support the stalking conviction in count 1 and the jury's finding that a restraining order was in effect at the time of the stalking.

II.  The Sentence on Count 2 Should Be Stayed Pursuant to Section 654

Defendant argues that his sentence on count 2 should be stayed pursuant to section 654 because count 2 arose out of the same course of conduct as count 1.  The People correctly concede.

Section 654 "precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.)  " 'Where a defendant's crimes are the result of a course of criminal conduct, courts endeavor to determine whether the course of conduct is divisible, i.e., whether it constitutes more than one criminal act. [Citation.]  A course of conduct will give rise to more than one criminal act if the actions were incident to more than one objective.' " (*People v. Roles* (2020) 44 Cal.App.5th 935, 946.)

Defendant was found guilty of stalking in violation of a restraining order during the time period of July 1, 2019, through November 19, 2019 (§ 646.9, subd. (b), count 1) and violating a protective order on or about November 15, 2019 (§ 273.6, subd. (a), count 2).  In finding defendant guilty of count 1, the jury had to find that he willfully harassed or willfully and repeatedly followed the victim and made a credible threat with the intent to place her in reasonable fear for her safety or the safety of her family.  It also had to find that a temporary restraining order prohibiting him from engaging in such conduct was in effect at the time.  In finding defendant guilty of count 2, the jury had to find that a court issued a

11

written order that he not contact the victim in any way and stay at least 100 yards away from her home, job, and vehicle; that the order was a stay away order issued under Family Code section 6300; that defendant knew of the order and had the ability to follow it; and that he willfully violated it. Both parties agree that the convictions in counts 1 and 2 arose out of the same course of conduct, in that defendant's conduct of stalking the victim in count 1 formed the basis of him violating the protective order in count 2. Moreover, the protective order used to prove defendant's guilt on count 1 (§ 646.9 subd. (b)) is the same protective order used to prove defendant's guilt on count 2. Accordingly, the sentence on count 2 should have been stayed pursuant to section 654.

III. The Court Properly Sentenced Defendant to the Upper Term on Count 1

Defendant argues that the matter should be remanded for sentencing since the trial court mistakenly believed it did not have the discretion to grant probation. He further contends the court improperly imposed the upper term on count 1, relying on factors that were either unauthorized or unsupported by the evidence. We conclude the court properly sentenced defendant to the upper term on count 1.

"When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. . . . The court shall select the term which, in the court's discretion, best serves the interests of justice." (§ 1170, subd. (b).) Sentencing courts have wide discretion in weighing aggravating and mitigating factors. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) A single factor in aggravation is sufficient to justify the imposition of the upper term. (*People v. Cruz* (1995) 38 Cal.App.4th 427, 433.) " 'The burden is on the party

12

attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.)

Defendant first contends that the court mistakenly believed that section 646.9, subdivision (b), unlike subdivision (a), did not allow it to grant probation. The court did state that section 646.9, subdivision (b), did not give it discretion to provide a grant of probation. However, any error was harmless. Even if the court was mistaken in its understanding, the record is clear that it would have declined to place defendant on probation. The court expressly stated: "Had the court been given discretion for probation, the court still would not be granting the defendant probation in this case, given the facts that were presented at trial."

Furthermore, the trial court properly exercised its discretion in imposing the upper term. It read and considered the People's sentencing brief and the probation officer's report. In support of the upper term, the court cited the factor that "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." (Cal. Rules of Court, rule 4.421(a)(1).) It noted that defendant harassed and traumatized the victim by leaving her voice messages and driving by and parking his car near her house. It further noted that she continued to be fearful based on his actions over the period of time, as detailed in her testimony as well as a letter she wrote to the court, which was read at sentencing. The evidence clearly supported

13

this aggravating factor. In October 2019, defendant left the victim over 30 voicemails telling her that if she was dating someone, that person would be dead and she would be dead too, that her stepdad was "going to pay," that defendant was going to bust her mouth, that she would cry "tears of blood," and that her kids would end up in a foster home. Furthermore, defendant drove by her house about five or six times a day that same month. At one point, he parked in front of her house and stared at her while holding a gun. The victim testified that she felt anxious and scared, and she feared for her life.

Defendant contends that repeated harassment resulting in fear is an element of stalking and therefore could not be used to impose the upper term. He cites California Rules of Court, rule 4.420(d), which provides that, "[a] fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term." However, as the People point out, a person can be convicted of stalking under section 646.9 with only two acts of harassing a victim. (§ 646.9, subds. (e) & (f).) Here, defendant left over 30 threatening voicemails and drove by the victim's house five or six times *a day*, thereby placing her in a perpetual state of fear. Thus, we have no trouble seeing, as the trial court did, that defendant's stalking involved "threat[s] of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 4.421(a)(1)) far beyond that which is necessary for conviction.

The court also cited the factor that the victim was particularly vulnerable. (Cal. Rules of Court, rule 4.421(a)(3).) In *People v. Steele* (2000) 83 Cal.App.4th 212 (*Steele*), the trial court found that one of the aggravating factors was the victim's vulnerability. The victim testified that "she was afraid of appellant by his actions and past reputation, and also

14

by the fact that appellant knew where she lived." (*Id*. at p. 226.) The appellate court agreed with the trial court, finding it "difficult to assail the finding that the victim was vulnerable." (*Ibid*.)

Here, the court noted that many of the incidents occurred during the night or early morning hours when the victim was home sleeping. The court stated that the victim's security system showed that defendant drove by her house, and that being there alone with her kids "certainly does make her particularly vulnerable." Although it is unclear that the evidence showed the incidents occurred during the night or early morning or when the victim was sleeping, it did show that defendant drove past the victim's house countless times and that he followed her and her children. At sentencing, the court heard the victim's statement, in which she said that she was not able to go in her front or back yard without fearing defendant would be outside to hurt her, and that she was afraid that at night, he would "come to my house and knock down my door and either kill me or take my kids." In light of the evidence that defendant had threatened the victim for years, followed her and her children, had a gun, and surveilled her house, the court properly relied on her vulnerability as an aggravating factor, particularly since defendant often appeared when the victim was alone with her children and had already demonstrated his willingness to inflict physical violence upon her. (See *Steele*, *supra*, 83 Cal.App.4th at p. 226.)

In sum, only one aggravating factor was needed for the court to impose the upper term on count 1. The evidence warranted the application of one or more aggravating factors in this case. Thus, we see no abuse of discretion.

## DISPOSITION

The judgment is modified to stay the term imposed on count 2 pursuant to section 654.  The trial court is directed to amend the abstract of judgment and its minute order to reflect this modification and to forward a certified copy of the amended abstract of judgment to the Director of the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

16